532 So.2d 1207 (1988)
Willie Lee WHITE
v.
STATE of Mississippi.
No. 57448. No. DP-66.
Supreme Court of Mississippi.
August 3, 1988.
Rehearing Denied November 16, 1988.
*1209 Charles Douglas Evans, Grenada, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., Felicia C. Adams, Sp. Asst. Atty. Gen., Jackson and Edwin A. Snyder, Dist. Atty., Jack B. Lacy, Jr., Asst. Dist. Atty., Eupora, for appellee.
En Banc.
GRIFFIN, Justice, for the Court, as to Part One:
Willie Lee White was indicted for capital murder in the Circuit Court of Grenada County, on February 7, 1985. Under the "Enhancement Portion of the Indictment" he was charged as an habitual offender to be sentenced pursuant to Miss. Code Ann. § 99-19-81 (Supp. 1984). In a hearing prior to the trial phase, defendant filed a motion to suppress physical evidence seized after the arrest, which the lower court granted. Additionally, the court excluded from evidence, following a pre-trial motion to suppress, photographs from the line-up which included the defendant and from which he was identified by a witness to the crime.
Trial commenced, and after hearing evidence pertaining to the guilt phase, the jury returned a verdict of guilty as charged. The same jury heard evidence on the sentence phase and unanimously found that the mitigating circumstances did not outweigh the aggravating circumstances, and that appellant should suffer the death penalty. The trial court sentenced him to death.
On December 18, 1985, around eleven o'clock p.m., Officer Jerry Wayne Cross of the Grenada Police Department was flagged down in front of Poo-Nannie's Cafe in Grenada, Mississippi, by Willie Glen Ward, while in the course of a routine patrol. Ward advised Officer Cross that Annie Dale Lewis, the owner of Poo-Nannie's, had been shot, and that she needed an ambulance and medical attention. Lewis subsequently died three (3) days later, as a result of the bullet wounds.
Ward, along with Tommy Bishop, had been at nearby Roger's Cafe where they heard two gunshots, which had brought them outside and toward Poo-Nannie's. Both men noticed a trail of money on the ground which lead to the cafe, and this prompted them to approach the establishment's door. Just then two people, a black male and a black female, exited the door and departed up the street. Neither Ward nor Bishop recognized the fleeing figures. Bishop then peered into the door, saw Annie Dale's body, and told Ward she had been shot. Cross then arrived during the course of his normal rounds.
Ward told Cross that he and Bishop had seen two people leave the cafe just moments before, and the man had been carrying a gun in his hand.
Cross looked down the street and saw the departing figure with a "blue steel pistol" in his hand, and after calling him to stop, proceeded to give chase after the man changed his pace from a walk to a run. Cross was unable to catch the man and lost sight of him for a period of time, but when he did see him again Cross noted a black woman running alongside of the man.
In the course of the chase, Cross eventually caught the woman, one Willie Ruth "Bessie" Anderson. The black male escaped.
In a hearing on a motion to suppress physical evidence, the following testimony was taken from police officers who investigated the shooting and/or participated in the defendant's arrest:
On the day following the shooting at Poo-Nannie's, December 19, 1985, at approximately 11:30 a.m., Officer Arnold Hankins of the Mississippi Highway Patrol was driving along Interstate 55 when he heard a dispatch over the radio in which it was reported that a woman who lived on Hardy Road had seen two black males run by her house who aroused her suspicions. This woman  Lottie Frances Harris  had *1210 heard about the incident, and knew a manhunt was being conducted for two black men in the area; hence her call to the sheriff's office to report them.
Officer Hankins exited at Coffeeville and headed north to the county line on Route 51. He then decided "to ride on up on Cascilla Road a piece ... and turn around and come back to 51." About a quarter of a mile up the road Hankins spotted two black males, one fitting the description of a suspect in a shooting he had heard of in a radio transmission the night before given to him by Police Captain Joe Durr. Durr had informed him that there had been a shooting over at Annie Dale Lewis' place by two black males, "one possibly wearing blue-jeans and a white tee-shirt".
Based upon this, Hankins pulled up behind the men and, because they appeared to be partially frozen, he claimed to have had a reasonable suspicion sufficient to tell them to lay on the ground and spread their hands. He asked for identification, received none, and proceeded to frisk them for such. In his search he found a Crown Royal bag containing money, which he laid on the hood of the patrol car. Officer Johnny Grantham arrived, and a.38 caliber pistol was removed "from one of the subjects."
Durr had told Hankins that the department was looking for one James White and one Willie White in connection with the shooting. He also told Hankins the Grenada Police Department had a warrant on Willie White.
Grantham had also visited the scene of the crime, and after an investigation there went to the Grenada County Hospital Emergency Room to which Lewis had been transported. In response to being asked who shot her, Lewis said that "it was that old thuggish White boy that had been sent to the pen." This statement was excluded at the trial because it was not shown that the deceased knew she was dying.
Grantham said that there were outstanding warrants for Willie White for assault and for the robbery, as well as one for aggravated assault on another occasion.
Finally, Bruce Partridge, an investigator with Miss. Highway Patrol testified to the call received from Lottie Harris. He and Officer Johnny Lovorn headed up Highway 51 thereafter and arrived just a few minutes after Grantham. Lovorn reached over and pulled the gun out of Willie White's belt.
Willie Lee White and L.V. White were placed under arrest and taken to the Grenada Police Department. Photographic identification of Willie Lee White was made by Sam Spearman two or three days later, who placed Willie Lee White at the scene of the crime and as the individual with the gun in his hand. Sam Spearman, along with his uncle Jimmy Earl Spearman, had been sitting in a car on a hill near Poo-Nannie's when the shooting occurred. Ward recalls seeing one of the Spearman boys at the cafe; Bishop does not.
Willie Lee White, Jr. was indicted for capital murder on February 7, 1985, and under the "Enhancement Portion of the Indictment" he was charged as an habitual offender to be sentenced pursuant to Miss. Code Ann. § 99-19-81 (Supp. 1984). As a result of Judge Morgan's having sustained defendant's motion to suppress, all physical evidence taken from the arrest was excluded, including a gun and a Crown Royal Bag. [NOTE: No finding as to probable cause was made; the judge simply stated that Hankins, a highway patrolman whose jurisdiction did not extend to Cascilla Road, was without authority of law to make the arrest]. Additionally, the court excluded from evidence, following motion to suppress, the photographs used in the photographic line-up shown by Officer Greg Harris of the Grenada Police Department to Sam Spearman, as the product of an illegal arrest. The court did, however, allow Spearman's in-court identification of the defendant, saying that:
1. That the witness had ample opportunity to view the Defendant in this case; that the Court has observed the witness and has concluded that he had the ability to make the determination and recall the Defendant. His attention was drawn to the Defendant for sufficient opportunity for that, and that there was a short time *1211 between the time of his sighting of the Defendant and his identification of the Defendant in this case.
The Court is going to find that based on the totality of the circumstances that in this case there is no violation of any applicable constitutional rule that would prohibit this witness, who is present at trial, who possesses the knowledge and the ability to identify the Defendant, from observations at the time of the crime, and the Defendant is physically present here today.
The substance of the State's case at trial primarily was predicated upon the testimony of witnesses Sam and Jimmy Earl Spearman. Both Sam and Jimmy gave statements to the officers. Jimmy's pre-trial statement contradicted his trial testimony. Sam's testimony was consistent as to material matters. They testified as follows: the two were seated in a car at a point up on a hill approximately 104 feet from the entrance to Poo-Nannie's. They saw two black men and a black woman enter the cafe in a well-lit area. Sam states that he recognized the defendant by sight, but not by name. (James Earl knew Willie Lee White both by name and by sight). The boys (James was 18 and Sam 16 years of age at the time) saw three people  including Willie White  approach the cafe and enter its door. They heard shots and then saw one man leave with a sack of money, some of which was falling out behind him in a trail-like manner. This man did not have a gun. After the young men left the car, they saw the defendant and the woman come through the door; the defendant had a gun in his hands. They then saw this couple proceed up the street.
Sam states that he got out of the car and joined the crowd gathering outside of Poo-Nannie's. James Earl states that he was present in the doorway when the two made their getaway. Also, James verifies the statement of other witnesses that several went to the door of the cafe and saw the defendant at the cash register with a gun in his hand and Mrs. Lewis lying on the floor shot in the mouth. Present with the defendant was Willie Ruth "Bessie" Anderson. She had no gun.
Also testifying was Dora Lee Jackson, who stated that she was present at a party on Union Street in Grenada on the night of the killing, when at approximately 8:00 or 8:30 in the evening the defendant, his brother and Anderson appeared. The purpose of her testimony was to show that the trio had been together during the evening in question and that the defendant at that time had a gun; however, the judge excluded the evidence concerning the gun on the ground that this was evidence of another crime  a felon carrying a concealed weapon.
The deceased's son, Richard Lewis, appeared as a witness and stated that his mother at closing time at Poo-Nannie's would take the change out of the cash register and put it in a paper sack and then place the paper sack in a Crown Royal sack where she kept her bills, and from there she would lock the Crown Royal sack in the trunk of her car. At the close of this witness's testimony, the State rested.
The jury deliberated for forty minutes during the trial phase, and rendered a verdict finding the defendant guilty as charged. An additional fifty-five minutes of deliberation was spent during the sentencing phase, out of which the jury found defendant should suffer death for the capital murder of Annie Dale Lewis.
Following motions for a judgment notwithstanding the verdict and for a new trial, both of which the trial court overruled, White appeals his guilt and sentence to this Court.

APPELLATE REVIEW OF TRIAL PHASE

I.
The State's compliance with Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice.
Under this error appellant alleges the State failed to comply with Rule 4.06 in that: (1) the State failed to inform White fully concerning agreements reached between the prosecution and witnesses (Sam *1212 and James Earl Spearman) to be used against him; and (2) the State failed to disclose to appellant factual contradictions within the statements given by the Spearmans. White contends such error violates his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights to the U.S. Constitution, as well as his rights under Article 3, Sections 8, 14, 23, 26 and 28 of the Mississippi Constitution, and as such his conviction should be set aside. In support thereof, appellant cites Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) as illustrative of denial of due process where the prosecution failed to comply with discovery mandated under state law.
In Brady, supra, at 373 U.S. 87, at 83 S.Ct. 1196, the Supreme Court held that the due process clause of the Fourteenth Amendment is violated where the prosecution suppresses evidence favorable to and requested by an accused, where the evidence is material either to guilt or to punishment, and which is done irrespective of the good or bad faith of the prosecution. The suppressed evidence in Brady involved extrajudicial statements of an accomplice to a murder. The high court declined to reverse Brady's conviction, stating instead that:
We usually walk on treacherous ground when we explore state law, for state courts, state agencies, and state legislatures are its final expositors under our federal regime. But, as we read the Maryland decisions, it is the court, not the jury, that passes on the "admissibility of evidence" pertinent to "the issue of the innocence or guilt of the accused." Giles v. State, 229 Md. 370, 183 A.2d 359 [1962], supra. In the present case a unanimous Court of Appeals has said that nothing in the suppressed confession "could have reduced the appellant Brady's offense below murder in the first degree." We read that statement as a ruling on the admissibility of the confession on the issue of innocence or guilt. A sporting theory of justice might assume that if the suppressed confession had been used at the first trial, the judge's ruling that it was not admissible on the issue of innocence or guilt might have been flouted by the jury just as it might have been done if the court had first admitted a confession and then stricken it from the record. But we cannot raise that trial strategy to the dignity of a constitutional right and say that the deprival of this defendant of that sporting chance through the use of a bifurcated trial (cf. Williams v. New York, 337 U.S. 241, 93 L.Ed. 1337, 69 S.Ct. 1079)) denies him due process or violates the Equal Protection Clause of the Fourteenth Amendment.
In Malone v. State, 486 So.2d 367 (Miss. 1986), (Malone II), this Court granted a motion for post-conviction relief in part, concerning a case in which we previously affirmed the defendant's conviction for armed robbery and sentence of eleven years imprisonment. Malone v. State, 486 So.2d 360 (Miss. 1986) (Malone I).
In Malone II the appellant's complaint centered on what he alleged to be a formal plea bargain agreement between the prosecution and its star witness, which was not disclosed to him prior to trial. The substance of Malone's agreement was that there existed an agreement between the witness and the state that, in exchange for testifying, the witness would be given the most lenient lawful sentence for the crime she had committed. Malone claimed the withholding of the plea agreement inhibited his counsel in his efforts at cross-examining the witness and abridges Malone's due process rights. This Court agreed, and said that:
Nondisclosure of the prosecution's plea agreement with a codefendant under circumstances where the terms of that agreement might reasonably touch upon the codefendant's credibility or otherwise undermine confidence in the outcome of the trial may vitiate a criminal conviction and require a new trial. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Fuselier v. State, 468 So.2d 45, 50-51 (Miss. 1985); Barnes v. State, 460 So.2d 126, 131 (Miss. 1984); *1213 King v. State, 363 So.2d 269, 274 (Miss. 1978). This rule emanates from the familiar case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Impeachment evidence as well as exculpatory material area within its scope. United States v. Bagley, 473 U.S. at 676-77, 105 S.Ct. at 3380-81, 87 L.Ed.2d at 490. Failure to produce Brady material does not depend upon the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218, nor upon the specificity of the defense request. United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. at 2392, 2400-01, 49 L.Ed.2d 342 (1976).
Malone, 486 So.2d at 368.
Although the witness denied any such agreement, we held on appeal that Malone, including certain papers in the record, had made out "an adequate prima facie showing that there was an advance plea agreement between the prosecution and [the witness]." Malone at 369. These "papers" included a copy of the circuit court's order, entered 24 hours after Malone's conviction, accepting the witness' plea and sentencing her to the minimum sentence. The substance of Malone's argument was further supported by an affidavit executed by an attorney for one of Malone's and the witness' co-defendants. The attorney therein stated that prior to trial such a plea bargain agreement did, in fact, exist.
We held this to be "evidence favorable to the accused," Brady, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218, and as such afforded Malone a basis for post-conviction relief. Miss. Code Ann. § 99-39-5(1)(a), (e) and (i) (Supp. 1985).
We then determined that, on remand, the circuit court should then consider in an evidentiary hearing whether the plea bargain said to have existed "is [if it did exist] material in the sense that its suppression undermines confidence in the outcome of the trial." Malone II at 369, quoting United States v. Bagley, 473 U.S. at 667, 105 S.Ct. at 3375, 87 L.Ed.2d at 481.
In the case at bar the defendant requested the following:
Upon request of the defendant, the prosecution shall furnish to the court in camera any prior written statements of witnesses. If these materials are found to be materially inconsistent with the witness's testimony, the statements shall be supplied to defense counsel prior to cross-examination.
The lower court ruled that discovery would be provided pursuant to Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice.
The record reflects that pre-trial interviews of the Spearmans were conducted with appellant's attorney present. There is no evidence elsewhere in the record of any meetings held or agreements reached between the prosecution and the witnesses, nor any indication that any matter discoverable pursuant to Rule 4.06 was withheld from the defendant.
We find no error to this first proposition assigned.

II.
Refusal of the trial court to suppress in-court identification of defendant, based upon its being the product of an impermissibly suggestive pre-trial procedure.
Pre-trial identification of White was made by Sam Spearman in the form of a photographic line-up. Prior to his picking the appellant out of an array of six photographs, Sam had given to the police a statement in which he told them he had seen a black man with braided hair leaving the cafe.
Sam was shown six photographs only one of which pictured an individual with braided hair. Sam picked White as the individual he'd seen the night of the murder. Further, he stated at the motion to suppress the photographs that several of the men in the photographs were known to him.
The lower court granted White's motion to suppress and found the photographs to be inadmissible, but allowed in-court identification. The current guideline *1214 is to be found in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The standards announced in the preceding cases have been adopted by this jurisdiction. In York v. State, 413 So.2d 1372 (Miss. 1982), we find the following applicable standard:
Only pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed. A lineup or series of photographs in which the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer, is impermissibly suggestive. (citations omitted) A show up in which the accused is brought by an officer to the eyewitness is likewise impermissibly suggestive where there is no necessity for doing so. (citations omitted)
Also in York this Court said:
An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the subject at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
Even if testimony is proffered of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word "irreparable."
In determining whether these standards are fulfilled, Neil v. Biggers states the following may be considered:
... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
490 U.S. at 199, 93 S.Ct. at 382.
In the final analysis, under Manson v. Brathwaite, "reliability is the linchpin in determining the admissibility... ."
York at 1383.
See also, Thompson v. State, 483 So.2d 690, 692 (Miss. 1986); Robinson v. State, 473 So.2d 957, 960 (Miss. 1985); and Tobias v. State, 472 So.2d 398, 399 (Miss. 1985).
Taking into consideration the criteria set forth in Manson and adopted by this Court in York, we find the in-court identification passes inspection. Sam Spearman recognized the defendant, having seen White on numerous previous occasions. Spearman testified he saw the defendant at the time of the incident in question under a street light, and for this viewing Spearman was only one hundred feet away. Spearman noted that White entered Poo-Nannie's at his leisure, but left the cafe in a hurry with a gun in his hand, and after two shots had been fired. Spearman's description of the distinctive braids worn by White qualified as an accurate description of the suspect. Finally, only six days passed between the date of the crime and the confrontation, the fifth and final factor for our consideration.
With this in mind, we cannot say that there was error in the trial court's allowance of appellant's in-court identification, and accordingly this proposition is denied.

III.
The competency of witnesses Sam and James Earl Spearman to testify.
Appellant alleges the State's two key witnesses  Sam Spearman and James Earl Spearman  were incompetent to testify, and he attacks the validity of their statements for two reasons: (1) the Spearmans did not retain a full comprehension of their duty to tell the truth; and (2) as conceded perjurers the testimony of the Spearmans was insufficient to support a sentence of death.
The general rule of competency concerning witnesses is governed by Rule 601 of the Mississippi Rules of Evidence, adopted effective January 1, 1986. Rule 601 states that "every person is competent to be a *1215 witness except as restricted by Mississippi Code Sections 13-1-5 (competency of spouses) and 13-1-11 (persons convicted of perjury or subornation of perjury), or by these rules." (emphasis added)
Appellant contests the validity of the witnesses' testimony, alleging that their failure to understand the oath they have taken undermines their entire testimony. However, while Sam stated he did not know the meaning of the word "oath", he did testify to understanding what it meant to tell the truth, and that he had, in fact, done so. Similarly, James Earl testified he knew what was meant when he swore to tell the truth.
In a jury trial, the jury is the arbiter of the weight and credibility of a witness' testimony. Rainer v. State, 473 So.2d 172 (Miss. 1985). See also Watson v. State, 465 So.2d 1025 (Miss. 1985); Williams v. State, 463 So.2d 1064 (Miss. 1985). While this rule of law speaks to credibility rather than competency, the thrust of appellant's two-pronged argument is towards the former. While we do not disagree with White's assertion that a greater scrutiny is required in his case ("Because of the qualitative difference [between death and any other punishment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment for a specific case,") Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), we find that this portion of his argument addresses a factual question well within the province of the jury, and this Court will not set aside his conviction without concluding that the evidence taken in the most favorable light could not have supported a reasonable juror's conclusion that the defendant was guilty beyond a reasonable doubt. Williams, supra, at 1068; May v. State, 460 So.2d 778 (Miss. 1984); and Fairchild v. State, 459 So.2d 793 (Miss. 1984).
The second prong of White's argument relies upon a fact not in evidence. Appellant claims the testimony of James Earl Spearman, as a conceded perjurer, was insufficient to support a sentence of death. Without addressing the issue of sufficiency, this proposition is disposed of in its entirety in that what is required is a conviction of perjury (under Miss. Code Ann. § 97-9-59 (1972)) and that is simply not the case. The incompetency of a perjurer to become a witness is based upon a guilty verdict. Isonhood v. State, 274 So.2d 685 (Miss. 1973).
There is no merit to this error assigned.

IV.
Coercion of witnesses to testify by the State.
This argument was previously raised and discussed under Assignment of Error I. The record does not reveal evidence of coercion by the State; therefore, there is no merit herein.

V.
Excusal for cause of prospective venire-persons Oliver Wright and Reubertha Bew.
In this fifth proposition White contends the trial court erred in excusing for cause prospective jurors Oliver Wright and Reubertha Bew because they stated during voir dire that they could vote for the death penalty under certain circumstances, but that neither could sign the verdict of death.
No objection was made at that time, and this error was not properly preserved for review by this Court. See Cannaday v. State, 455 So.2d 713 (Miss. 1984) (where defendant attempted to challenge exclusion of two prospective jurors on the basis of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but made no contemporaneous objection, the claim was not properly preserved for appellate review). See also, Ratliff v. State, 313 So.2d 386 (Miss. 1975); Pittman v. State, 297 So.2d 888 (Miss. 1974); and Myers v. State, 268 So.2d 353 (Miss. 1972).

VI.
Prosecutorial misconduct.
White contends that the prosecution did not conduct itself fairly during the *1216 course of his trial, thus depriving him of his constitutional rights. In particular, appellant alleges the State (1) injected evidence into the trial depriving him of due process under the law; (2) made blatant attempts to incite the jury by appealing to the victim's family; (3) patently violated his privilege against self-incrimination during closing argument; and (4) made reference to his alleged flight from authorities as being evidence of "a guilty mind."
This alleged error fails for several reasons. We have reviewed carefully the record, and have found that no objections were made and hence the issues have not been preserved for us on appeal. This rule's applicability is not diminished in a capital case. Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985); cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss.), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983). And, on the occasion where objection was made[1] and sustained, failure to move for mistrial is fatal to preservation of any possible error in the exchange on appeal. See, Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366, rehearing denied, 476 U.S. 1189, 106 S.Ct. 2930, 91 L.Ed.2d 557 (1986).
It is true that this Court has reversed death penalty sentences where the cumulative effect of prosecutorial misconduct has denied appellant a fair and impartial trial. Stringer v. State, 500 So.2d 928 (Miss. 1986). However, as the allegations in White's argument fall far short of the misconduct alleged in Stringer, and the lower court was given no opportunity to correct itself, we find this alleged error to be procedurally barred.

VII.
Restraint by the lower court on cross-examination of prosecutorial witnesses.
White argues here that certain objections made by the State and sustained by the trial court involving cross-examinations of the State's witnesses denied him his Sixth Amendment right to confrontation and violated Rule 5.08 of the Uniform Criminal Rules of Circuit Court Practice.
This is the instance of restraint cited by appellant:
[On cross-examination of State's witness, Officer Harris]
BY MR. EVANS:
Q. Officer Harris, did you talk to Jimmy Spearman that same day?
A. Yes, I did.
Q. Did he tell you about a female being in the car with him and Sam?
BY MR. SNYDER:
Objection, Your Honor, hearsay.
BY THE COURT:
Sustained.
White contends this was impeachment evidence of Sam Spearman, and not offered to prove the truth of any matter asserted.
*1217 First, we note that the lower court allowed this same evidence during the testimony of James Earl Spearman. Hence, any possible error was cured. See e.g., Knox v. State, 502 So.2d 672 (Miss. 1987).
Further, apparently the defense was attempting to impeach Sam Spearman on what we deem to be a collateral matter, and for this reason we find no "improper restraint." In Williams v. State, 73 Miss. 820, 19 So. 826 (1896), this Court held that a witness may only be impeached on a statement which embodies "a fact substantive in its nature and relevant to the issue made in the case." 73 Miss. at 824, 19 So. at 827.
The question of whether there was a girl in the car with the Spearmans has no bearing on the guilt or innocence of Willie Lee White. Thus, the matter is collateral. See also, Stringer v. State, 500 So.2d 928, 933 (Miss. 1986).

VIII.
Denial of White's motions for a continuance, limited individual sequestered voir dire, or a change of venue, where there was alleged violation of an order to control prejudicial pre-trial publicity.
Prior to trial, White filed motions for individual sequestered voir dire and to control prejudicial pre-trial publicity. Motion for individual sequestered voir dire was denied; motion to control pre-trial publicity was granted. Motion for continuance was made in light of what the defense termed a violation of the order to control the prejudicial pre-trial publicity. This alleged violation came in the form of a radio broadcast on January 29, 1986, which stated the following:
Today a murder case is scheduled to be tried in circuit court. A Grenada man in his early thirties, Willie Lee White, Jr., stands trial for shooting a local store owner, sixty-five year old Annie Dale Lewis. Lewis was critically injured and later died. She was shot in the head in an alleged robbery at Poo-Nannie's. The robbery occurred in December of '84. The process of selecting a jury to hear the murder trial should begin sometime this morning when it reconvenes at nine a.m.
In ruling on the motion for continuance, the trial court found the broadcast to be within its previous order regarding matters of public record.
BY THE COURT:
The Court finds that the broadcast today, which included the date, would have been well within the order of the Court regarding the broadcast of matters of public  the broadcast of matters of public record. The only factual data included in the report were the ages of the Defendant and the victim, the location of the wound and where the alleged event occurred.
While the Court finds that this broadcast may have been outside the bounds in some portions of the order, it was certainly not material, and there is no evidence whatsoever that it has in any way prejudiced this jury.
This motion is overruled.
Appellant alleges the trial court had two options in White's case: first, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); see also, Johnson v. State, 476 So.2d 1195 (Miss. 1985); Fisher v. State, 481 So.2d 203 (Miss. 1985).
Second, he contends, the trial court must, under certain circumstances, permit limited individual sequestered voir dire. The court cannot simply accept a negative nonvocal response to a solitary question concerning the possibility that jurors may be biased. See, e.g., Fisher, supra, at n. 16 ("voir dire, when most skillfully performed, is often ineffective to discover the extent to which a juror's vote may be affected by what he has heard about the case").
However, both Johnson, supra, and Fisher, supra, involved situations where: (1) the public was bombarded with news coverage concerning the capital murder; *1218 and (2) motions for change of venue were denied. In the case at bar, the news report was minimal at best, and the record contained no evidence that a motion for change of venue was filed by defendant. Thus, there is no showing of prejudice and the point has not been preserved for appellate review. Wetz v. State, 503 So.2d 803 (Miss. 1987).
In Johnson, supra, 476 So.2d at 1210, we said that
The accused's right to a change of venue is clearly not self-executing; the defendant must file a motion supported by the affidavits of two witnesses with knowledge. Gilliard v. State, 428 So.2d 576, 579 (Miss. 1983); Gentry v. State, 416 So.2d 650, 651 (Miss. 1982); Purvis v. State, 71 Miss. 706, 14 So. 268 (1893).
White made no such effort. Thus, there is no merit to this proposition.
Similarly, the denial of the motion for continuance, predicated upon the trial court's determination that White had failed to show any violation of its order, was proper, and showed no abuse of discretion. Arteigapiloto v. State, 496 So.2d 681 (Miss. 1986); see also, Cole v. State, 405 So.2d 910 (Miss. 1981); Miss. Code Ann. § 99-15-29 (1972).
Finally, we find no error in the trial court's denial of defendant's motion for individual sequestered voir dire.
In West v. State, 463 So.2d 1048 (Miss. 1985), this Court held that:
Rule 5.02 Miss.Unif.Crim.R.Cir.Ct.Prac. (1979), provides:
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court.
Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
Appellant's contention that he should have been allowed to individually voir dire jurors out of the presence of the others is not supported by the decisions of this Court. The procedure followed by the trial court has been repeatedly upheld. Billiot v. State [454 So.2d 445 (Miss. 1984)], supra; Speagle v. State, 390 So.2d 990 (Miss. 1980); Gray v. State [351 So.2d 1342 (Miss. 1977)], supra; Peters v. State, 314 So.2d 724 (Miss. 1975).
463 So.2d at 1054.
Accordingly, there is no error herein.

IX.
Contact between jurors in White's trial and family and friends.
White contends telephone contact between the jury and the outside created a presumption of prejudice never rebutted by the State, and the trial court committed reversible error in its generosity.
The following exchanges are pertinent to our disposition of this assignment of error:
BY THE COURT:
I'm going to let the jurors make those calls now.
BY MR. EVANS:
No objection.
BY THE COURT:
The jurors at this time are going to be allowed to make phone calls in the presence of the bailiff to those persons that need to be notified about their needs and where to take their belongings for the overnight stay.
* * * * * *
I instruct you again, as I do every evening and every time we're on break, not to discuss this case among yourselves. Do not allow anyone to discuss it with you. I'm going to allow you to make that call. I realize that there are some of you that may be concerned about family members and I want to allow you to make that same call in the morning, there being no objection from defense counsel 
BY MR. EVANS:
No, Your Honor.
No objections were made and, therefore, these issues have not been preserved for appellate review. Cole, supra.
*1219 The appellant received a fair and impartial trial before a jury composed of nine members of his race, with his rights fully protected by a fair judge who excluded all evidence where he entertained any question concerning its admissibility. We, therefore, conclude that his conviction should be affirmed as to the guilt phase.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
ROBERTSON, Justice, for the court:

Sentencing Phase
White assigns several points as error in regard to the sentencing or penalty phase of the proceedings below. We need consider only one, to-wit: his charge that the evidence was legally insufficient to support the sentence of death imposed upon him.
We begin with our legislature's directive. Miss. Code Ann. § 99-19-101(7) (Supp. 1987) provides:
In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) the defendant actually killed;
(b) the defendant attempted to kill;
(c) the defendant intended that a killing take place;
(d) the defendant contemplated that lethal force would be employed.
See Pinkton v. State, 481 So.2d 306, 309-10 (Miss. 1985). Such findings may follow only from credible evidence.
Section 99-19-101(7) was enacted in 1983 in obvious response to Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The metamorphosis of case rule to statutory element of proof renders today's analysis quite different from that which may be employed by a court ruling in the absence of a state statute. Arguably, in a state without statutory requirement, Enmund and progeny may require only that overall sentencing trials be examined by some competent court for the presence of some level of culpability which catapults the criminal actor beyond the magical "intent" threshold. See Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).
Our legislature has chosen a quite different structure for this area of the law by establishing two unyielding requirements:
(1) the state shoulders a definite and stringent burden to show
(2) specific and credible evidence establishing at least one of the prongs first described in Enmund and now, more importantly, embodied in Section 99-19-101(7).
What we have known since the advent of our statutory subsection, see Pinkton v. State, supra, and are now bound to employ is a standard of review based in the familiar concept of evidentiary sufficiency of jury verdicts. That Enmund and its progeny are helpful to our analysis goes without saying. To contend that they are all-controlling is quite simply wrong. In the end, we are concerned not so much with what a reader might extrapolate from the innuendo laden corners of this record but with what proof the prosecution laid before the jury prior to the jury's consideration and ultimate finding of the four statutory elements. More precisely, this sentence of death may be upheld only if we have before us a record which contains evidence legally sufficient that the jury may have found that Willie Lee White, Jr., killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed.
Section 99-19-107(7) does not identify the minimum quantum of proof which must be produced before one or more of the findings may be made. We have numerous rules in analogous situations and these are unanimous: that proof must be beyond a reasonable doubt. For example, the prosecution is required to prove each element of a criminal offense beyond a reasonable doubt. McCray v. State, 486 So.2d 1247, 1251 (Miss. 1986); Barnette v. State, 481 So.2d 788, 791 (Miss. 1985). Due process rights secured by the Constitution of the United States withdraw state authority to water down this requirement. Jackson *1220 v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576-77 (1979); Patterson v. New York, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281, 292 (1977). We enforce the beyond a reasonable doubt quantum of proof standard in the sentencing phase of capital murder trials. To be specific, capital sentencing juries have no authority to find a statutory aggravating circumstance or circumstances, see Miss. Code Ann. § 99-19-101(5) (Supp. 1987), unless such be "unanimously found beyond a reasonable doubt." Miss. Code Ann. § 99-19-103 (Supp. 1987).
The general quantum of proof rule for each element of a criminal offense at the guilt phase and the specific statutory rule regarding the burden of proof and quantum thereof on aggravating circumstances collectively exert an electromagnetic force on the present inquiry. We divine no principled basis upon which it may be said that the findings required under Section 99-19-101(7) are different from the aggravating circumstances contemplated by Section 99-19-101(5). Certainly, there is no articulable reason why the quantum of proof which ought be required of the prosecution of the findings of the Enmund factors under Subsection (7) should be different or lesser than the quantum of proof required for finding aggravating circumstances under Subsection (5) and Section 99-19-103. We hold that juries must be instructed that the findings under Subsection (7) must be made beyond a reasonable doubt.[1]
Here the proper instruction was given and the findings were made. The question then becomes whether the evidence was legally sufficient that the findings are placed beyond our authority to disturb.
As in other cases, our scope of review is limited. We must view the evidence and all reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt. See Peoples v. State, 501 So.2d 424, 428 (Miss. 1987); Weeks v. State, 493 So.2d 1280, 1282 (Miss. 1986); Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983).
A point bears emphasis. The quantum of proof required of a party at trial helps define the scope of appellate review. Because the prosecution's burden was beyond a reasonable doubt, White's assault on the Enmund findings required by Subsection (7) has a lesser hill to climb than if those findings could have been made, say, by a mere preponderance of the evidence. Where a preponderance standard obtains, evidence of a lesser quality and quantity may suffice to uphold a jury finding than would be required by virtue of the beyond-a-reasonable-doubt burden of proof standard. Compare Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); United States v. Taylor, 464 F.2d 240, 242 (2d Cir.1972); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512-13, 91 L.Ed.2d 202 (1986).
Applying all of this to the present record, we can say right off the bat that the evidence is legally insufficient to establish beyond a reasonable doubt that White killed or attempted to kill. But only one of Subsection (7)'s facts must be found. We turn to the other two.
We are less than certain of the precise difference between Subsection (c), "the defendant intended that a killing take place, and Subsection (d), "the defendant contemplated that lethal force would be employed." Subsection (c) has reference to the defendant's mental purpose and design that someone's life be taken. But what of Subsection (d)'s contemplation of lethal force? The two surely are not synonymous, although "contemplate" is one synonym for intend. See Roget's International Thesaurus § 653.7 (4th ed. 1977). This alone excludes the notion that Subsections (c) and (d) describe two mutually exclusive categories of culpability.
Careful attention to the King's English, definitional and grammatical, leads to the *1221 view that Subsection (c) is subsumed in Subsection (d), for we cannot imagine a case in which a defendant intended that a killing take place but somehow did not contemplate use of lethal force. In this sense Subsection (c)'s "intended that a killing take place" is surplusage and may with profit be set aside.
But the converse is not necessarily so. One may contemplate lethal force while stopping short of a definite plan or design to kill. In a sense, Subsection (d) describes a contingent intent. Where, as a part of pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed, Subsection (d) is satisfied. On the other hand, mere tort foreseeability  an objective, reasonable man approach  falls well short of what the statute requires.
Our scope of review well in mind, we return to the facts. The evidence is more than sufficient to show beyond a reasonable doubt that White, his brother, L.V. White, and Willie Ruth (Bessie) Anderson robbed Poo-Nannie's Cafe, that its owner, Annie Dale Lewis, was killed in the course of the robbery, and that White was present when the killing occurred.[2] But the evidence concerning the events before and after the robbery offers no indication which robber killed Lewis, or that any of the three contemplated in advance that lethal force would be employed.
More specifically, there is no evidence that White made any attempt to kill Lewis, or that he contemplated that lethal force would be used. Circumstantial evidence places White in the store with his brother and Anderson at the time Lewis was killed. This is enough to undergird the jury verdict that White was guilty of capital murder. Because nothing in the record legitimately suggests that White killed or contemplated any physical harm to Lewis, the death verdict dies.
To be sure, Sam Spearman testified that he saw Willie Lee White leaving the scene with a gun in his hand. There is nothing to show that this gun was the murder weapon, that White handled it before the shooting, or that it had even been fired, or that White knew of the presence of the gun until after the killing. Neither the murder weapon, nor any other gun, was received as evidence at trial. The evidence before the jury is wholly consistent with numerous other scenarios by which Willie White did not kill or anticipate a killing. Other reasonable hypotheses would suggest that L.V. White might have been the killer. Or Willie Ruth Anderson. What is important is that nothing in the record offers the jury a rational basis for selecting one hypothesis over the other. In sum, we have a pure absence of any proof on the elements contained in the sentencing statute.
This case is similar on its facts to Jones v. Thigpen, 741 F.2d 805 (5th Cir.1984), a case offered for the analogy and persuasiveness of its reasoning, not the authoritativeness of its holding.[3] In explaining the Court's refusal to affirm Jones' death sentence, U.S. Circuit Judge E. Grady Jolly wrote:
The record in this case does not tell us what Jones and his accomplices separately or collectively intended to do when they drove to downtown Biloxi in December of 1974. It does not tell us what happened inside Art's Levis Store. It does not specify who supplied or carried the weapon that was used to bludgeon Arthur Weinberger to death, and the weapon itself was not introduced at trial. This record does not tell us whether Jones or his accomplice did the actual killing. The State's case consists only of *1222 the testimony of several witnesses who observed Jones and his accomplice entering and departing the store, and the testimony of the witness who discovered Weinberger's body inside the store immediately afterwards. Enmund [from which Section 99-19-101(7) has been taken] undoubtedly, and unfortunately in this case, requires more.
741 F.2d at 817. Then in a footnote Judge Jolly explains the import of the Enmund rule:

Enmund, compels the anomalous result that two can avoid a capital murder ... [death sentence] where one could not. If Jones had been alone in this crime, we could, on the evidence against him in this record, uphold a ... [death sentence]. If he had been alone the jury could have reasonably inferred that he took the life of Art Weinberger. From this record we cannot say whether it was he or his accomplice, or both, and thus neither may receive the death sentence.
741 F.2d at 817 n. 1.
The only factual difference between this case and Jones lies in Sam Spearman's testimony that Willie Lee White was carrying a gun when he left the premises. Absent some basis for inferring that this gun was the murder weapon, or that White contemplated prior to the robbery that it be used as an instrument of lethal force, this one fact does not take this case out of the rationale of Jones.
A like understanding of Enmund in multiple defendant,/no eye witness cases may be found in the companion cases of People v. Jones, 94 Ill.2d 275, 68 Ill.Dec. 903, 906, 915, 447 N.E.2d 161, 164, 173 (1982); and People v. Tiller, 94 Ill.2d 303, 68 Ill.Dec. 916, 919-21, 926, 447 N.Ed.2d 174, 177-79, 184 (1982); and in State v. Emery, 141 Ariz. 549, 688 P.2d 175, 178 (1984).
In the present state of the record, we hold that the evidence was legally insufficient to enable a rational trier of fact to find beyond a reasonable doubt that Willie Lee White, Jr., killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed.
Our holding, though predicated on the statute, is nonetheless consistent with Enmund and its latest interpretation. Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Supporting the Court's remand in Tison is the requirement that proof be addressed concerning the state of mind of the actors where the only primary proof of culpability relates to commission of the underlying felony. Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). This holding is wholly consistent with our holding today that a death sentence be supported by proof.
The obvious difference in our reversing and rendering on White's sentence of death and the high Court's remand of Tison for further proceedings lies in our statute. Having failed to satisfy an element of proof, the State is not permitted a second bite at the apple. Due process rights secured to Willie Lee White, Jr., by Article 3, § 14 of the Mississippi Constitution of 1890 preclude enforcement of the sentence of death against him. See Pinkton v. State, 481 So.2d 306, 310 (Miss. 1985); see also Dycus v. State, 440 So.2d 246, 260 (Miss. 1983). So much of the judgment below as orders that White be put to death is reversed and rendered.
This does not end the matter. White was indicted as a habitual offender. See Miss. Code Ann. §§ 99-19-81 and -83 (Supp. 1987). If it be shown that he has committed two other felonies within the meaning of either Sections 99-19-81 or -83, and the other conditions of either of those statutes be satisfied, White may be sentenced thereunder. It is within this Court's actual knowledge that White has been convicted of at least one prior felony, the crime of armed robbery. See White v. State, 507 So.2d 98 (Miss. 1987). We remand this case to the Circuit Court of Grenada County for a hearing on the charge laid in the indictment that White is a habitual offender.
CONVICTION OF CAPITAL MURDER AFFIRMED; SENTENCE OF DEATH REVERSED AND RENDERED; CASE REMANDED TO CIRCUIT COURT FOR HEARING ON HABITUAL OFFENDER *1223 CHARGE AND FOR IMPOSITION OF LAWFUL SENTENCE.
PRATHER, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent to Part II by separate written opinion.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., join in separate written dissent.
HAWKINS, Presiding Justice, joining Justice GRIFFIN'S dissent as to Part II:
I join Justice Griffin's dissent.
The majority finds no incongruity in concluding that the Legislature intended by enactment of Miss. Code Ann. § 99-19-101(7) to make it more difficult to impose the death penalty than already required by the U.S. Supreme Court in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). I have some trouble believing our Legislature would be so disposed.
Even so, neither Miss. Code Ann. § 99-19-101(7) nor Enmund added to the State's burden under the facts in this case. If the State did not offer sufficient circumstantial evidence for the jury to find that White indeed "actually killed" Mrs. Lewis, I am at a loss as to how to make such a case. Mrs. Lewis was robbed and shot with a bullet. Just a moment after the shots were fired, White was seen next to the body and the cash register with a pistol in his hand. (The "smoking gun.") He and his accomplices fled. At trial White did not testify. Neither did the defense subpoena either of his two companions, L.V. White and Willie Ruth "Bess" Anderson, to testify.[1]
If this had been a straight murder case with only White indicted, the State would still have had to prove that he shot Mrs. Lewis. Can this Court seriously maintain there could have been insufficient circumstantial evidence to convict?
Justice Robertson quite plainly stated in Fisher v. State, 481 So.2d 203, 214 (Miss. 1985), that this Court is not required to rule out every reasonable hypothesis consistent with innocence in a circumstantial evidence case. He noted:
To be sure, this is a circumstantial evidence case. We have reviewed the entire record with some care. We would be less than candid if we did not state forthrightly that we have some doubts. Nevertheless, from a review of the record, we are left with a definite impression that Larry Fisher probably killed Melinda Gail Weathers and incident thereto raped and robbed her.
This issue, however, turns not upon how we see the evidence, for there are, well established in hundreds of cases, rational and necessary limitations upon our scope of review of jury verdicts the substantial components of which involve resolution of issues of fact. We have said repeatedly ... that, if there is substantial evidence in the record of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury's guilty verdict. See, e.g., Burge v. State, 472 So.2d 392, 396 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984). Here we are subject to the same limitations on our scope of review, only we are required to keep in mind the arguably stricter burden of proof placed upon the state in circumstantial evidence cases. See, e.g., Flanagin v. State, 473 So.2d 482, 485 (Miss. 1985); Hester v. State, 463 So.2d 1087, 1093-94 (Miss. 1985).

*1224 In saying these things we are sensitive to the fact that a rational, fair-minded jury could well have found Fisher not guilty. Cases such as this force upon us the reality that our self-imposed limited scope of review of jury verdicts is at best "the least imperfect way we have of ... [resolving such matters]". As in Culbreath v. Johnson, 427 So.2d 705 (Miss. 1983).
Were we to substitute our view [of the reasonable inferences that may be drawn from] the facts for the ... [jury's], one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by ... [twelve citizens, peers of the defendant, who are on the scene and smell the smoke of the battle]. (Justice Robertson)
427 So.2d at 708; Burge v. State, 472 So.2d at 396 (Justice Robertson); see also City of Jackson v. Locklar, 431 So.2d 475, 479 (Miss. 1983) (Justice Robertson).
[Brackets in original]
481 So.2d at 214. See also: Whittington v. State, 523 So.2d 966, 983 (Miss. 1988) (Robertson, J., concurring with written opinion); Montgomery v. State, 515 So.2d 845, 849-52 (Miss. 1987); (Robertson, J., concurring with written opinion); Ratliff v. State, 515 So.2d 877 (Miss. 1987) (Justice Robertson).
Having repeatedly made olympian pronouncements that this Court must not usurp the function of the jury, especially in a circumstantial evidence case, the majority pays absolutely no attention to its own words, and decides in this case it is indeed proper for this Court to be a supplemental jury.
The majority first states:
To be sure, Sam Spearman testified that he saw Willie Lee White leaving the scene with a gun in his hand.
And then the majority as jury pronounces:
There is nothing to show that this gun was the murder weapon, that White handled it before the shooting, or that it had even been fired, or that White knew of the presence of the gun until after the killing.
No. We will never know whether this pistol was the murder weapon. The State never had possession of this weapon. White did. For all the State knows it is in the mud at the bottom of some river. Why should the State be required to show more? Neither White nor his accomplices produced his pistol, which, if the majority's hypothesis is correct, would conclusively prove it was not used in Mrs. Lewis's death. To suggest the State should somehow be required to locate the murder weapon as a condition precedent to making a jury issue is astounding.
Nor, will we ever know that White handled the pistol seen in his hand before the shooting, or that it had been fired, or that he even knew of the gun until after the killing. Why? Because each of these questions can only be answered by White or one of his accomplices, and none of them chose to testify. White did not choose to subpoena the accomplices.
The point is that the woman was shot with a weapon consistent with the weapon White was seen holding as he stood beside her body, just before he fled. And, it is unexplained.
The only person who could offer an explanation as to why White, with a pistol in his hand, was standing next to a murdered woman only seconds after she was slain, and then joining the bird gang, was White (unless one of his companions chose to testify). He was not forthcoming.
Then the majority, again as a jury, informs us that the evidence before us is "wholly consistent with numerous other scenarios by which Willie White did not kill... ." Why? The majority tells us that L.V. White or Anderson could have shot Mrs. Lewis and handed White the pistol. That is a reasonable hypothesis, according to the majority. If this astonishing assumption indeed had been the case, can any rational mind believe one or the other of these three would not have been placed on the witness stand?[2]
*1225 The point is the State went as far as it can ever go in this case. And what the State did offer, unexplained, was sufficient to create a jury issue on the question of whether White shot and killed Mrs. Lewis. The majority has created an impossible shell game in which the State will never be able to convict any of the three for capital murder.
The fifth amendment privilege against self-incrimination of the U.S. Constitution gives an accused an absolute right not to testify, and the State may not comment upon it. Also, if an accused requests it, he is entitled to an instruction from the court that the jury can draw no unfavorable inference from his failure to testify. West v. State, 485 So.2d 681 (Miss. 1985); Wood v. State, 221 Miss. 901, 74 So.2d 851 (1954); Funches v. State, 125 Miss. 140, 87 So. 487 (1921).
Where the majority has jumped the track in its reasoning is changing this from a defensive to an offensive weapon. The majority carries this Constitutional right much further than our decisions. It thinks that when sufficient facts have been adduced to produce in the rational mind a belief beyond a reasonable doubt that person is guilty, if there remain any possible hypotheses of facts which would clear him, the jury (or this Court) is required to supply them from the air, even though the only person on earth who can supply the actual facts is the defendant. This was not the law until the majority spake.
Let us take the case of stolen property found in the possession of the accused two days later. Now, there could be one, a dozen, a hundred, or an infinite number of possible, reasonable explanations how the accused acquired possession other than larceny. Is the State required to supply them, when the only person on earth who absolutely knew is the defendant? In Tuttle v. State, 252 Miss. 733, 737, 174 So.2d 345, 346-47 (1965), this Court stated:
Besides, the appellant did not even testify, nor did he offer evidence in conflict with the state's evidence. The prohibition against adverse comment and inference does not protect a defendant from the probative force of the evidence against him. Dealing with the failure of a defendant to testify, 1 Wharton's Criminal Evidence, sec. 146 at page 277 (12th ed. 1955), well says: "If a defendant does not attempt to rebut incriminating facts he cannot, merely by remaining silent, escape the natural and reasonable inference deducible from such facts. For instance, if in a case of larceny the theft and unexplained or unsatisfactorily explained recent possession of the stolen property of the accused are shown, he cannot avoid the natural inference, deducible from such facts, that he is the thief, by failure or refusal to testify."
See also: McGilvery v. State, 497 So.2d 67, 68 (Miss. 1986); Rush v. State, 301 So.2d 297, 300 (Miss. 1974).
In U.S. v. Cotter, 425 F.2d 450, 452 (1st Cir.1970), the First Circuit Court of Appeals held:
The defendant argues that if he taken the stand he might have testified that he himself had asked Mitchell for permission, and that is was refused, and that for the jury to deny him the benefit of that assumption in effect would violate his Fifth Amendment right. This is a total misconception of the amendment. The Fifth Amendment prevents the drawing of unfavorable inferences from the failure to testify; it does not prevent the drawing of affirmative inferences, or serve to rebut inferences that arise independently from other circumstances, unconnected with the defendant's failure to testify. [Emphasis added]
In U.S. v. Parness, 503 F.2d 430, 437 (2nd Cir.1974), the Second Circuit Court of Appeals stated:
As we recently stated in United States v. Frank, 494 F.2d 145, 153 (2 Cir.1974):
[T]he defendants were not required to testify or to present any case at all, and the jury could not permissibly draw an adverse inference simply from their failure to take the stand. But the selfincrimination clause does not elevate a defendant's silence ... to the level of convincing refutation. When a defendant has offered no *1226 [credible explanation], it may be reasonable for a jury to draw inferences from the prosecution's evidence which would be impermissible if the defendant had supplied a credible exculpatory version. [Emphasis added]
In People v. McClindon, 54 Ill.2d 546, 301 N.E.2d 290 (1973), the Supreme Court of Illinois held:
The defendants had an opportunity during the trial to explain their conduct just as any defendant has an opportunity to explain, rebut or contradict any evidence presented against him. In the absence of such an explanation, rebuttal or contradiction the evidence stands unchallenged before the jury. This court has stated concerning conduct similar to that involved in this case: "In the absence of explanation, such conduct is not consistent with that of an innocent person similarly situated... ."
The Seventh Circuit Court of Appeals in U.S. v. Clark, 776 F.2d 623, 627 (7th Cir.1984), stated: "But, the privilege of self-incrimination does not preclude the trier of the facts from drawing an adverse inference if justified by the facts." Also, Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965): "What the jury may infer, given no help from the court, is one thing." (And entirely different from the court or prosecution commenting upon it.)
22 A C.J.S. Criminal Law, § 593, p. 366: "It is equally clear that an accused cannot avoid the natural and reasonable inferences deducible from proved facts merely by remaining silent or by declining to become a witness."
In Moore v. U.S., 271 F.2d 564 (4th Cir.1959), the Court held:
In a criminal case the accused is protected, at every stage of the trial, with a presumption of innocence and until he is proven guilty beyond a reasonable doubt by proper and competent evidence. No inference of guilt can be drawn from the mere fact that the accused did not testify in his own behalf. These are fundamental principles which require no citation of authority. But other principles have not been overlooked or disregarded in reaching our decision. Circumstantial evidence may support a verdict of guilty, though it does not exclude every reasonable hypothesis consistent with innocence. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. If it be sufficient to support an inference of guilt and the defendant fails to offer a reasonable explanation consistent with innocence, such failure may be considered by the trier of fact. Wilson v. United States, 1896, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Jenkins v. United States, 4 Cir., 1932, 58 F.2d 556. It is not necessary, in appraising the sufficiency of the evidence, that this court be convinced beyond a reasonable doubt of the built of the defendant. Bell v. United States, 4 Cir., 1950, 185 F.2d 302. The question is whether the evidence, construed most favorably for the prosecution, is such that a jury (or trial judge) might find the defendant guilty beyond a reasonable doubt. Bell v. United States, supra; United States v. Brown, 2 Cir., 1956, 236 F.2d 403; Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391.
Id. at 568.
Also, State v. Clay, 29 Ohio App.2d 206, 280 N.E.2d 384, 388 (1972):
Where the prosecution makes a probable case on an issue as to which a defendant has a peculiar knowledge of the facts and may easily prove them, an inference arises that the truth is with the prosecution. Williams v. United States, 170 F.2d 319 (5th Cir.1948), cert. denied 335 U.S. 909, 69 S.Ct. 412, 93 L.Ed. 442.
In United States v. Ragland, 306 F.2d 732 (4th Cir.1962), the Fourth Circuit Court of Appeals in citing and quoting from Moore v. U.S., supra, observed, at 736:
It is noteworthy in this case that neither defendant testified, nor offered any evidence at all, to explain their possession of this large quantity of sugar.
* * * * * *
Nevertheless, protection of those fundamental rights (Fifth Amendment rights *1227 not to testify) does not mean that the failure of the defendant in a criminal case to explain highly suspicious circumstances, must be entirely disregarded by the trier of fact.
In Walker v. United States, 301 F.2d 94, 97 (5th Cir.1962), the Fifth Circuit Court of Appeals, citing Moore v. United States, supra, with approval, noted that a presumption "merely places the burden upon him (the defendant) as to matters peculiarly within his knowledge." [Emphasis added] Accord: United States v. Mancuso, 378 F.2d 612, 617 (4th Cir.1967).
Mrs. Lewis was shot and killed with a bullet; White was seen just a moment later standing next to her body with a pistol in his hand, and he fled. To conclude that this set of facts unexplained is somehow insufficient for a rational jury to find that White shot her is to me a total divestment of reason.
Equally bizzare is the notion that even though there is a total absence of proof in this record of any factual scenario supporting a hypothesis of innocence (and which, incidentally, could only be given by White), that it is this Court's obligation to supply out of thin air a possible set of hypothetical facts consistent with innocence.
I was always under the impression that if the accused wanted to suggest an alternative hypothesis not apparent from the proven facts, he had an obligation to offer some proof thereasto.
Where is there any proof that some other pistol shot Mrs. Lewis? Not in this record. Who is the only person who could supply such proof? White (or his accomplices).
Where is there any proof suggesting that L.V. White or Anderson (or the Man in the Moon) shot Mrs. Lewis and then handed White the weapon? Not in this record.
Yet the majority has supplied these hypotheses, and insulted our intelligence by suggesting that they are reasonable.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and GRIFFIN, J., join this opinion.
GRIFFIN, Justice, dissenting, as to part two:
With deference, I respectfully dissent.
In Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court found that the death penalty was inconsistent with the Eighth and Fourteenth Amendments, where there was no proof, indicating that the petitioner, who was the "wheel man" in a robbery, had actually participated in the victims' murders. Specifically, the Court held the death penalty unconstitutional "in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken... ." Id. at 801, 102 S.Ct. at 3378-9, 73 L.Ed.2d at 1154.
In this case, eye-witnesses, having heard two shots, saw the defendant standing at a cash register with a gun in his hand, next to the victim's body. Clearly, the factual scenario prompting Enmund's holding, where the getaway car's driver in a robbery unwittingly became an accomplice to a murder, bears no similarity to White's participation in his victim's robbery and murder.
Nevertheless, based on this evidence, the majority finds that the jury could not have found that White met the requirements of Miss. Code Ann. § 99-19-101(7) (Supp. 1987), admittedly adopted in response to Enmund, since the evidence was insufficient to show that (1) White actually killed Annie Dale Lewis, (2) White attempted to kill Annie Dale Lewis, (3) White intended that Annie Dale Lewis's killing take place, and (4) White contemplated that lethal force would be used, notwithstanding the fact that the jury had made these findings.
In support, the majority cites a footnote to a concurring opinion in Jones v. Thigpen, 741 F.2d 805, 817 (5th Cir.1984), vacated 475 U.S. 1003, 106 S.Ct. 1172, 89 L.Ed.2d 292 (1986), where Judge Jolly wrote,

Enmund compels the anomalous result that two can avoid a capital murder conviction where one could not. If Jones had been alone in this crime, we could, on the evidence against him in this record, uphold a capital murder conviction. *1228 If he had been alone the jury could have reasonably inferred that he took the life of Art Weinburger. From this record we cannot say whether it was he or his accomplice or both, and thus neither may receive the death sentence. (emphasis in the original)[1]
The United States Supreme Court rejected this contention, and our decision, based on the footnote, is absurd  indeed, laughably inept; nevertheless this ineptness spread to the majority of the Court.[2],[3]
Section 99-19-101(7) reads:
In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.
Although the majority acknowledges that the statute was an "obvious response" to Enmund, it gives the statute an interpretation other than that accorded previously either to Enmund or to § 99-19-101(7), noting, only obliquely, that the "statutory element of proof renders today's analysis quite different from that which may be employed by a court ruling in the absence of a state statute." Perhaps the majority will excuse the admission that we fail to divine any substantial or meaningful difference between Enmund and § 99-19-101(7), both quoted above, where the operative words of both are identical.
A review of Enmund in the federal courts and of § 99-19-101(7) in this Court will highlight this comparison and underscore our conclusion.

FEDERAL COURTS
In Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the United States Supreme Court reexamined Enmund, defining the scope of its prohibition. There, the petitioners, sons of a convict, brought a large ice chest filled with guns into the prison, which housed their dad and his cellmate. After their escape into the desert, the five men decided to flag down a motorist in an attempt to steal a car.
Soon, a car stopped for them. Overpowered, its four occupants were driven down a gas line service road where at least one of the victims begged for his life. While the petitioners stood some distance away, filling water bottles, the two convicts killed the four with shotgun blasts. The petitioners, though stating that they were surprised by the killing, made no effort to aid the victims. Instead, they fled, together.
In Justice O'Connor's majority opinion, she spoke of Tison as a "mid range felony-murder" case, Id. at ___, 107 S.Ct. at 1687, 95 L.Ed.2d at 143, as opposed to "felony-murder simpliciter," where participation in any felony in which there is a killing justifies the death penalty, e.g., Enmund, and "at the other end of the spectrum," felony-murder, where the prosecution must prove an intent to kill or actual participation in a killing. Id. at ___, 107 S.Ct. at 1682, 95 L.Ed.2d at 137. In such mid range felony-murders, the Court held
that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that *1229 conduct causes its natural, though also not inevitable, lethal result.
Id. at ___, 107 S.Ct. at 1688, 95 L.Ed.2d at 144.
Consequently, though the petitioners were not at the trigger, but some distance away  indeed, though they were surprised by the killings  the death penalty was constitutional, given their "major participation in the felony committed, combined with reckless indifference to human life... ." Id. at ___, 107 S.Ct. at 1688, 95 L.Ed.2d at 145.
The Fifth Circuit has also reviewed several Enmund claims. Most recently, in Glass v. Butler, 820 F.2d 112 (5th Cir.1987), the Court rejected the petitioner's claim that Tison precluded the death penalty where, following a prison escape, the petitioner and an accomplice broke into the victims' home, immediately prior to their murders, committed by the accomplice. Specifically, the petitioner contended that the death penalty was unconstitutionally applied, since his participation had been coerced. In response the Court stated that "it would have been necessary to show only that [the petitioner] intended or participated in the killing, or participated in the offense with a reckless indifference to the plight of the [victims] to be subject to the death penalty." Id. at 113-14. See also, Glass v. Blackburn, 791 F.2d 1165, 1173 (5th Cir.1986).
In Johnson v. McCotter, 804 F.2d 300 (5th Cir.1986), the Court rejected an Enmund related appeal, where the appellant had participated in the armed robbery of a jewelry store, in which another had shot and killed the storekeeper. Citing Skillern, infra, the Fifth Circuit found that the jury had been properly instructed, when asked "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result... ." Id. at 302. See also, Johnson v. McCotter, 794 F.2d 1011, 1012-13 (5th Cir.1986).
Significantly, the United States Supreme Court and the Fifth Circuit have held that participation in a felony with a "reckless indifference" to human life is sufficient to sustain the death penalty. This includes participating in kidnapping (Tison), burglary (Glass), or robbery (Johnson), where an armed accomplice acts as the triggerman. In short, federal courts have upheld the death penalty, where it is known that an armed accomplice committed the murder, while a majority of this Court, unable to determine which of three assailants killed Annie Dale Lewis, refuses to inflict a like punishment on White, though at a minimum it is known that he robbed his victim, holding a gun.
The Fifth Circuit has even upheld the death penalty where a rational juror "could have concluded beyond a reasonable doubt that defendant actively participated in the killing of the victims (whose deaths were obviously purposefully inflicted)," Wingo v. Blackburn, 786 F.2d 654, 655 (5th Cir.1986), quoting State v. Wingo, 457 So.2d 1159, 1165 (La. 1984), though there was "no direct evidence (in the guilt phase) of defendant's role in these crimes." Wingo v. Blackburn, 783 F.2d 1046, 1049 (5th Cir.1986). See also, Skillern v. Estelle, 720 F.2d 839, 844 (5th Cir.1983). But cf. the majority opinion: "Circumstantial evidence places White in the store with his brother and Anderson at the time Lewis was killed. This is enough to undergird the jury verdict that White was guilty of capital murder. Because nothing in the record legitimately suggests that White killed or contemplated any physical harm to Lewis, the death verdict dies." (emphasis added) The italicized language is supported neither by precedent nor the evidence.
Finally, in Jones v. Thigpen, 788 F.2d 1101, 1102 (5th Cir.1986), following remand from the United States Supreme Court, where the evidence linking the petitioner with a murder was his complicity in a robbery and blood on his boots, the Fifth Circuit found that, but for other claims, it would leave to Mississippi courts "whether Jones possessed the Enmund level of culpability." See Cabana v. Bullock, 474 U.S. 376, 392, 106 S.Ct. 689, 700, 88 L.Ed.2d 704, 720 (1986). It did not hold, as before, *1230 that the petitioner came under Enmund as a matter of law.

MISSISSIPPI SUPREME COURT
This Court has previously examined § 99-19-101(7) under the "constitutional standard enunciated in Enmund" without reliance upon the present sophistry, which attempts to distinguish Enmund from the statute. Jones v. State, 517 So.2d 1295, 1302 (Miss. 1987). For example, in Jones, the Court dismissed an Enmund related assignment of error, although there was conflicting evidence as to the triggerman's identity, where the jury found that Jones had both intended a killing to occur and contemplated the use of lethal force. See also, Jones v. State, 461 So.2d 686, 701 (Miss. 1984).
Similarly, in Irving v. State, 498 So.2d 305, 313 (Miss. 1986), where at the sentencing hearing the appellant's cousin admitted to the murder, this Court, on motion for post-conviction relief, stated that "there was ample evidence to support the jury's finding that the defendant armed himself for the purpose of robbing the deceased, and that the murder was a necessary consequence thereof. This case is not factually related to Enmund." See also, Irving v. State, 441 So.2d 846, 851-52 (Miss. 1983).
In Gray v. State, 472 So.2d 409, 412 (Miss. 1985), the appellant testified that immediately following a fist fight, which had left the victim "breathless," he handed a butcher knife to a woman at her request, "telling her to say what she had to, but to make it fast." The appellant then left the scene. Finding the jury properly instructed, the Court stated, "In this case [the appellant] admitted that [the woman] told him she wanted [the victim] killed and that he, [the defendant], supplied [the woman] with the murder weapon after disabling the victim. This admission by [the appellant] establishes the requisite personal culpability under Enmund v. Florida. ..." Id. at 420.
Finally, in Cabello v. State, 471 So.2d 332, 345-6 (Miss. 1985), tried immediately after the adoption of § 99-19-101(7), where the only evidence of the defendant's participation in the murder was that he left the hotel room with his son, returning at the same time as his son, who drove the victim's automobile, this Court stated,
The facts now before us are distinguishable from those upon which Enmund was decided. Specifically, we think unbelievable, in view of the evidence, the premise that sixteen-year-old Frank, Jr. single-handedly bound, gagged and strangled the adult male victim while Frank, Sr. stood by and neither killed, attempted to kill, nor intended a killing or that lethal force would be employed to insure the robbery's success. Rather, the alternative inference is logical: that Cabello, the father and family leader, was the dominant party in the crime. We are of the opinion that the Enmund shield does not extend to protect this defendant as revealed by the evidence.
These cases reflect that the Court has specifically adopted the "constitutional standard enunciated in Enmund," denying its application even where the triggerman's identity is in dispute (Jones, Irving,), where the defendant leaves the crime scene before the murder (Gray), as well as where the defendant's presence and participation are the subject of only circumstantial evidence (Cabello). Obviously, these cases do not support the majority's contention that the "metamorphosis of case rule to statutory element of proof" varies between Enmund and § 99-19-101(7). See also, Wiley v. State, 517 So.2d 1373, 1378 (Miss. 1987); Lockett v. State, 517 So.2d 1317, 1338 (Miss. 1987); Pinkton v. State, 481 So.2d 306, 309-10 (Miss. 1985); Johnson v. State, 477 So.2d 196, 217 (Miss. 1985); Stringer v. State, 454 So.2d 468, 479 (Miss. 1984); Williams v. State, 445 So.2d 798, 807 (Miss. 1984); Leatherwood v. State, 435 So.2d 645, 656 (Miss. 1983); Edwards v. Thigpen, 433 So.2d 906, 908 (Miss. 1983).

CONCLUSION
Enmund prompted the legislature to adopt § 99-19-101(7). Obviously, the legislature preferred that a jury make the requisite Enmund findings in capital cases, and in this manner, our statute varies from *1231 Enmund. See, Cabana, 474 U.S. at 392, 106 S.Ct. at 700, 88 L.Ed.2d at 720. Yet, who would have dreamed that a majority of this Court would now hold that the legislature cast a heavier burden upon the prosecution, when enacting § 99-19-101(7), than had the United States Supreme Court in Enmund. In particular, who would have dreamed the nightmare that this Court would base such a holding upon a footnote to a concurring opinion of a decision vacated by the United States Supreme Court.
Incredibly, the majority also finds its decision consistent with Tison, even though Tison found the death penalty constitutional where the accused is not the triggerman, but only engages in "criminal activities known to carry a grave risk of death," e.g., arming convicts. Tison, 481 U.S. at ___, 107 S.Ct. at 1688, 95 L.Ed.2d at 144. Fifth Circuit cases to the contrary, upon which the majority relies, Jones v. Thigpen, 741 F.2d 805 (5th Cir.1984), vacated 475 U.S. 1003, 106 S.Ct. 1172, 89 L.Ed.2d 292 (1986), and Reddix v. Thigpen, 728 F.2d 705 (5th Cir.1984), modified 805 F.2d 506, 517 (5th Cir.1986), were either vacated by the United States Supreme Court or modified upon further appeal. The majority though is unable to find that wielding a weapon during a robbery equates a criminal activity known to carry a grave risk of death. But see, Irving, 498 So.2d at 313 (death in an armed robbery is a "necessary consequence"). Moreover, it is wrong to suggest that Tison alters Enmund in a manner inconsistent with § 99-19-101(7). See, Johnson, 804 F.2d at 302.
Nevertheless, the majority reverses White's death sentence, sanctioned by the legislature and rendered by a jury of his peers, even though eye-witnesses saw White at the cash register with a gun in his hand, next to the victim's body, because unlike the twelve members of the jury, five members of this Court cannot determine, beyond a reasonable doubt, that this gun-wielding robber even contemplated that lethal force would be employed. The possession of a weapon during the commission of a felony in which there is a murder, though wrought by an accomplice, should satisfy any jury and any court that the defendant contemplated the use of lethal force, one of the requisite Enmund findings. To hold otherwise, especially under the facts of this case, is a miscarriage of justice.[4]
Consistent with the above, I dissent.
ROY NOBLE LEE, C.J., and HAWKINS and DAN M. LEE, P.JJ, join this dissent.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., join in separate written dissent.
NOTES
[1] BY MR. SNYDER:

Q. Son, who was the first person that you told the truth to?
A. My brother.
Q. What's your brother's name?
A. James Spearman.
Q. How old is James?
A. About thirty-eight.
Q. When did you tell James the truth?
A. That night it happened.
Q. What did James tell you?
BY MR. EVANS:
Your Honor, I'm going to object to anything that his brother told him because it's completely irrelevant to this case.
BY THE COURT:
I sustain the objection to what his brother told him.
BY MR. SNYDER:
Q. Did your brother tell you not to get involved?
A. Yes, sir.
* * * * * *
Q. When the police car came down the street, did either of the Spearman boys say anything to the policeman?
A. Yes, they did.
Q. What did he say?
BY MR. EVANS:
Your Honor, I object to hearsay.
BY MR. LACY:
No further questions, Your Honor.
BY THE COURT:
Do you wish any re-cross?
BY MR. EVANS:
None, Your Honor.
[1] Sentencing Instruction C-1 submitted to the jury in this case correctly included in unmistakable language this beyond-a-reasonable-doubt burden of proof requirement.
[2] All of this is sufficient to undergird a conviction of capital murder. In that connection, we are concerned with a statutory form of felony murder rule. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1987). The crucial distinction is that intent was not required before White was guilty of capital murder. It was enough that he was an active participant in the robbery of Poo-Nannie's Cafe in the course of which Lewis was killed by one of the participants. Our legislature has directed, however, that greater culpability be required before the penalty of death may be inflicted.
[3] See Thigpen v. Jones, 475 U.S. 1003, 106 S.Ct. 1172, 89 L.Ed.2d 292 (1986), on remand, 788 F.2d 1101 (5th Cir.1986).
[1] Now, an Enmund question conceivably could apply to L.V. White or Anderson, neither of whom had the pistol.
[2] Unless they could somehow anticipate the strange conclusion reached by the majority.
[1] In the majority opinion, Justice Robertson inserts the words "death sentence" in the two instances where the word "conviction" appears. As the quote reads in the original, Judge Jolly commented that two could avoid a capital murder conviction, not just the death sentence, where one could not.
[2] The majority makes reference to White's assault on Enmund. In fact, the assault is by the majority; White makes none. Neither at trial nor in his brief to this Court, did White allege an Enmund error; rather, the author of the majority opinion has raised the issue. Although Miss.Sup.Ct.R. 28(a)(3) allows the Court to recognize "plain error," an error based on a footnote to a concurring opinion of a vacated decision is hardly plain.
[3] The majority opinion now requires that in the absence of an eye-witness, neither of two assailants, who commit murder, may receive the death penalty, if neither "squeals."
[4] A civilized society must believe that its judicial system will punish criminals in a manner prescribed by law. Should society ever doubt the judicial system's ability and resolve to enforce the law, anarchy will result, where victims or their families rely upon their own initiative to punish criminals. Our freedom would not long endure in this environment.