# IN THE COURT OF APPEALS 09/17/96

# OF THE

# STATE OF MISSISSIPPI

## NO. 95-KA-00667 COA

**TERRY BUTLER**

**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**


THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B


TRIAL JUDGE: HON. WILLIAM F. COLEMAN

COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:

GEORGE T. HOLMES

ATTORNEYS FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY: JOLENE M. LOWRY

DISTRICT ATTORNEY: EDWARD J. PETERS

NATURE OF THE CASE: CRIMINAL - HOMICIDE

TRIAL COURT DISPOSITION: GUILTY OF MANSLAUGHTER; SENTENCED TO SERVE TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS


BEFORE BRIDGES, P.J., COLEMAN, AND KING, JJ.

COLEMAN, J., FOR THE COURT:

Although a grand jury in Hinds County indicted Terry Butler for the murder of one Morris Duane Jones, a petit jury convicted him of manslaughter. Pursuant to the jury's verdict of "Guilty of manslaughter," the trial court sentenced Butler to serve a term of twenty years in the custody of the Mississippi Department of Corrections. In this appeal Butler raises six issues, all of which we decide adversely to him. Thus, we affirm.

## I. Facts

At approximately 1:00 a. m. on Saturday, September 3, 1994, Morris Duane Jones drove his motorcycle to Summer Street in the City of Jackson in search of crack cocaine. Near the intersection of Summer Street with Silas Brown Street, Jones stopped his motorcycle to consummate the purchase of two rocks of crack cocaine with a group of three or four male youths who had gathered on the side of Summer Street. Among those youths whose presence in the group cannot be questioned were fifteen-year-old Jessie Banks, whose nickname was "Man," seventeen-year-old Michael Harper, and seventeen-year-old Marvin Travis Hayes. The minutia of the transaction are inconsistent; but this group of fledgling mercantilists expected Jones to pay them the going rate of $20 per rock, or a total of $40 for both rocks of crack. Instead, Jones handed one of their number two small bills which had been folded with other paper so as to appear to be the customary $40 for the two rocks which they anticipated being paid for their merchandise.

Either Michael Harper or Terry Butler expressed the group's frustration with their bungled closing of the sale and their displeasure with Jones' financial duplicity by shooting Jones twice in his left side as he departed the scene of his chicanery astride his motorcycle. Jones lost control of his motorcycle and jumped the curb a very short distance from where he had obtained the crack. The address of the location where Jones' motorcycle came to rest with Jones was 502 Silas Brown Street. Bernice Shoulders, who lived at 937 Summer Street, adjacent to where the shooting had occurred, had gone to bed when she was awakened by the sounds of three shots followed by the noise of a motorcycle's passing by her house. Shoulders then heard Jessie Banks, one of the youths who had been in the group who had sold the crack to Jones, knock on the window and the front door to awaken her. Banks urged Shoulders to call an ambulance "because it might save a man's life." She eventually called 911 at approximately 1:25 a. m. to report that "somebody out there had got killed . . . ." Another of the youths, Michael Harper, also came over to her house and sat on the porch. In response to that call, Jackson police officer Eddie Denton, who was on regular patrol, responded to a call he had received about the shooting. When he arrived at 502 Silas Brown Street, he found members of an ambulance crew who were attending to Jones. Jones was lying in the yard "partially on the motorcycle and half-way off, lying on his side." The ambulance crew showed patrolman Denton where Jones had been shot twice in his left side.

Dr. Steven Hayne, a forensic pathologist, performed an autopsy on Jones' body, and found approximately two quarts of blood in his chest cavity which the upper bullet had caused by traversing his left lung and heart before it exited his body. A second bullet had entered his abdominal cavity but did not exit his body.

## II. Trial

A grand jury jointly indicted Michael Harper and the Appellant, Terry Butler, for Morris Duane Jones' murder. In return for his testimony against Butler, the State reduced the charge from murder to manslaughter, to which reduced charge, Harper pleaded guilty. The circuit court sentenced Harper to serve a term of twenty years in the custody of the Mississippi Department of Corrections. At Butler's trial for murder, Harper testified that when Jessie Banks, who apparently took Jones' money, told them that Jones had bamboozled them with only $2.00, Butler told him to give Harper's gun to him. When Harper gave Butler his gun, which he had bought off the street the day before, Butler emptied its five bullets in Jones' direction. Jessie Banks testified that he saw Harper give his pistol to Butler and then saw Butler shoot the gun several times at the man on the motorcycle. Butler's defense was that of alibi. His mother, two sisters, and a friend, Anthony Brown, testified to vouch for Butler's being passed-out drunk from early Friday evening until well past 1:00 a. m. Saturday morning on the front room floor of his parents' home located within a couple of blocks of where Jones was shot. According to his mother, Hilda Butler, her husband, Shakespeare Butler, had bet Terry $10.00 early Friday evening that he could not chug-a-lug a pint of whiskey. According to his mother, Terry tried but lost the bet, the result of which was that Terry passed out cold on the floor of their front room, where he remained the rest of the night.

In his defense, Butler called Marvin Hayes in anticipation that he would testify that while he, Marvin Hayes, was with the group on Summer Street in the wee hours of Saturday, September 3, 1994, Butler was not. Instead, Hayes, who was under indictment for other charges unrelated to this episode, claimed his right not to incriminate himself on advice of his counsel, who was present in the courtroom, and declined to answer any of Butler's counsel's questions. Butler then sought to have the trial court adjudicate that Hayes was unavailable so that he could introduce an affidavit that Hayes had made on April 7, 1995, in which Hayes stated under oath as follows:

> I did not see Terry Butler a/k/a "Pedru" on the scene [at Summer Street when Jones was shot] that evening anywhere. Terry Butler did not shoot the white male and was not involved in this shooting in any way whatsoever.

The trial judge declined to introduce into evidence Hayes' affidavit dated April 7, 1995. Butler also called Steven Earl Williams to testify that Butler had not been present when Jones was shot, but as did Hayes, Williams, also under indictment for unrelated charges, also "took the fifth" on advise of counsel and declined to answer any of Butler's questions.

After the jury had retired to deliberate, they sent a note to the trial judge to advise him that they had reached a verdict, although the note further stated that one juror wished to advise the court that her vote was "under duress." The note did not indicate the nature of their verdict, and the jury did not send their verdict with the note. Following a discussion among the trial judge, the assistant district attorney, and Butler's counsel about the consequences of the one juror's having voted "under duress, " the trial judge instructed the bailiff to return the jury to the courtroom. When the jury had assembled before the bench, the judge inquired if they had reached a verdict, to which the foreman replied that they had. The trial judge asked the bailiff to hand the jury's verdict to him, and he then

showed the verdict to the assistant district attorney and Butler's counsel. The trial judge then polled the jury to determine if the verdict was unanimous, the result of which was that all twelve jurors each stated affirmatively that it was his or her verdict.

Notwithstanding the results of the jury's poll, the trial judge, without objection from either the State or Butler, addressed them as follows:

> Now, the last inquiry that I had -- excuse me, let the record reflect that it is a unanimous verdict -- stated we have reached a verdict. One member of the jury has requested that her vote was denoted "being under duress." Now, duress has a lot of different meanings to various people. Duress under the law has one meaning. And I can say this, that if a vote is under duress, that could not be considered an independent vote for a finding of guilty of manslaughter. Do all of you understand?

(AFFIRMATIVE RESPONSE BY JURORS)

> Now, if that juror is still persisting that -- I believe it refers to a female -- her vote was under duress; that is, it was forced, then, I cannot accept this verdict. And I will further remind you of Instruction Number 7 that was given to you; that is, the instruction that's numbered up near the heading, jury instruction number, and it's filled in 7, provides that each of you must decide the case for yourselves, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations do not hesitate to re-examine your own views and change your opinion if you're convinced it is erroneous. But do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Do all of you understand that a vote under duress is not a vote for a finding of guilty of manslaughter? Do all of you understand?

(AFFIRMATIVE RESPONSE BY JURORS)

> Okay. Now, I need for you to retire to the jury room, consider what I have said, and then I'll ask you to come back. If you reach -- if you feel that you have reached a unanimous verdict, write your verdict out again on any verdict that you might find. I'm giving you separate sheets of paper. Is this procedure acceptable to the State?

BY MS. BENNETT: Yes, your Honor.

BY THE COURT: To the defense?

BY MR. HOLMES: Yes, your Honor.

> BY THE COURT: You may now retire to continue your deliberations.

Regardless of his consent to this procedure, Butler's counsel moved for a mistrial. To support the motion for mistrial, Butler's counsel argued: "If the jury proceedings have been spoiled by duress in any way, even though Court is being as careful as possible, I don't think that duress can be cured." The trial court denied the motion for mistrial. Again the jury returned into open court, after which the following occurred:

> BY THE COURT: Mr. Foreman, have you reached a unanimous verdict?

BY THE FOREMAN: We have.

> BY THE COURT: Hand it to the bailiff, please. (Examining Verdict). We, the jury, find the defendant guilty of manslaughter, signed, Foreman Again, do each of you understand I'm asking did you individually vote for this finding, verdict, and this time I'll ask if it is without duress. Do each of you understand I'm asking did you vote for finding of guilty of manslaughter without duress from the other members of your panel? Number one, is this your vote?

(AFFIRMATIVE RESPONSE BY ALL JURORS.

BY THE COURT: It is unanimous. And again, I'm asking is this without duress?

(AFFIRMATIVE RESPONSE BY ALL JURORS)

> BY THE COURT: That you're all in agreement that the defendant is guilty of manslaughter.

(AFFIRMATIVE RESPONSE BY ALL JURORS)

> BY THE COURT: Thank you. It is unanimous again. Any further inquiry?

> BY MS. BENNETT: None by the State

> BY MR. HOLMES: I'd like to know which juror initially felt that he or she was under duress.

> BY THE COURT: I don't think that's necessary. I think I made sufficient inquiry.

As we noted, the trial court later sentenced Butler to serve a term of twenty years in the custody of the Mississippi Department of Corrections.

**III. ISSUES AND THE LAW**

In his Statement of the Issues, Butler poses these six issues for this Court's appellate review and resolution:

> ISSUE I: Whether the court erred by not requiring the State to provide racially neutral grounds for using all of its jury challenges against members of the African American race?
>
> ISSUE II: Whether the incompetent, uncorroborated, unreasonable, improbable, self-contradictory and substantially impeached testimony of the two accomplices properly support the verdict in this case?
>
> ISSUE III: Was the jury properly instructed on reasonable doubt?
>
> ISSUE IV: Whether the verdict was a product of duress?
>
> ISSUE V: Should the court have admitted the affidavit of Marvin Hayes?
>
> ISSUE VI: Did the Court err by limiting defense counsel's closing argument?

This Court will review and analyze these issues in the order in which Butler's counsel presented them to it in the brief:

> **A. ISSUE I:** Whether the court erred by not requiring the State to provide racially neutral grounds for using all of its jury challenges against members of the African American race?

In *Gilmore v. State*, No. 93-KA-00064-COA, slip op. At 2-3 (Miss. Ct. App. July 2, 1996), Judge Roger H. McMillin, Jr., writing for the Court, summarized the evolution of *Batson* and its progeny as follows:

> The original decision in *Batson* dealt only with the limited instance where, in the trial of a member of a racial minority, it was alleged that the prosecution was improperly excluding prospective jurors of the same race as the defendant. *Batson,* 476 U.S. at 83-84. The United States Supreme Court subsequently expanded the prohibition of racially-motivated strikes by the prosecution to all criminal trials without regard to the race of the defendant. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). In *Georgia v. McCollum*, the Supreme Court carried the prohibition one step further and, in what has come to be known as the "reverse

*Batson*" case, ruled that strikes based on racial considerations were also prohibited to the defendant. *Georgia v. McCollum*, 505 U.S. 42, 55 (1992). There is more. Gender discrimination was prohibited in *J.E.B. v. Alabama ex rel. T.B.*, 114 S. Ct. 1419, 1422 (1994), and discriminatory strikes in civil litigation were halted in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 628-29 (1991).

In the case of *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987), the Mississippi Supreme Court explained the requirements of *Batson* in the following language:

> It is thus clear under *Batson 's* express terms that a defendant raising a *Batson* claim must show
>
> > 1. That he is a member of a "cognizable racial group";
> >
> > 2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and
> >
> > 3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.
>
> In sum, these components constitute the prima facie showing of discrimination necessary to compel the "state to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723, 90 L. Ed. 2d at 88.

As can be deduced from the previous quotation of this Court's opinion in *Gilmore v. State*, the first requirement, that the defendant be a member of a "cognizable racial group," has been eliminated by subsequent decisions of the United States Supreme Court. However, the latter two requirements remain as linchpins for challenges to prohibited forms of discrimination in a party's use of peremptory challenges during the selection of a jury.

The Mississippi Supreme Court then advised:

> *Batson* clearly places upon the trial court the duty to determine whether purposeful discrimination has been shown . . . . These findings largely turn on credibility and thus *Batson* states that "ordinarily," a reviewing court should give the trial court "great deference." *Id.* at 98, 106 S. Ct. at 1724, 90 L. Ed. 2d at 89, n. 21.

*Lockett*, 517 So. 2d at 1349. It concluded: "a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Id.* at 1350.

With this "standard of review" which *Lockett* established in mind, we note that in the case *sub judice*,

the State used six of its twelve peremptory challenges and that indeed it used all six of those peremptory challenges against black members of the panels of venirepersons. On the other hand, as the trial judge mentioned during the hearing on Butler's motion for new trial or for JNOV, or for resentencing, while the State peremptorily challenged six blacks, it tendered ten other black members of these venirepersons to Butler. Of those ten, Butler exercised one peremptory challenge on one black female. In other words, of the sixteen blacks who remained for consideration to serve on this jury, the State peremptorily struck six, or 37 1/2% of those who were considered.

The record also shows that of the first panel of twelve jurors, the State peremptorily challenged one black female and two black males, and Butler challenged one white female and one white male. Both sides accepted three black females and two white males. Of the second panel of venirepersons, the State challenged one black male, and Butler challenged four white females and one white male. From the second panel, both the State and Butler seated two black females and one white female. Of the third panel, the State challenged two black females, and Butler challenged one black female and three white females. From the third panel, the State and Butler agreed to seat four black females.

The trial judge's refusal to adjudicate that Butler had made a prima facie case that the State had used six of its peremptory challenges discriminatorily against black members of the venire was supported by substantial evidence and was not erroneous. Thus we decide Butler's first issue against him and affirm the trial court's denial of Butler's *Batson's* challenge to the State's use of six its peremptory challenges against six black members of the jury panels.

While Butler does not specifically include it within this first issue, he complains that the trial court's requiring him -- but not the State -- to give racially neutral reasons for his peremptory challenges of eleven white members of the four jury panels violated the Equal Protection Clause. He cites no authority to support this proposition, but we elect to address the matter briefly anyway.

The State did not propose a challenge to Butler's use of all twelve of his peremptory challenges to challenge eleven white members of the venire and one black member until after Butler challenged its use of its six peremptory challenges against Black members of the venire. In response to the State's challenge of Butler's use of all twelve of his peremptory challenges, the trial court found that Butler had used them discriminatorily and required him to give race-neutral reasons for his peremptory challenges of the eleven white members of the four jury panels. The trial court accepted all of Butler's race-neutral reasons except two. The result was that one white male was placed on the jury, which "bumped' a black female who was originally on the jury to a position of alternate juror. However, she was bumped as an alternate when the trial court refused to accept Butler's race-neutral reason for peremptorily challenging another white male. However, both of the alternates were excused when the jury began its deliberations, so only one white member of the venire made his way to the jury because the trial judge rejected Butler's peremptory challenge of him. Butler makes no issue of the trial judge's rejection of his race-neutral reason for challenging that one white male.

As Judge McMillin stressed in *Gilmore*, "what's sauce for the goose is [not always] sauce for the gander," when it comes to the genera of *Batson* challenges. *Gilmore*, No. 93-KA-00064-COA, slip op. at 5. Elimination of discriminatory use of peremptory challenges by either party remains the objective of *Batson* and its progeny. Thus, one party can offend *Batson* by discriminating in its use of peremptory challenges, but the other party may not so offend *Batson* by its use of peremptory

challenges. *Batson* does not permit nor require the trial court to treat the non-offending party in the same way that it must treat the offending party. Thus, the trial court did not violate the Equal Protection Clause, as Butler argues, when it required him to give race-neutral reasons for his eleven peremptory challenges of white members of the four jury panels from whom Butler's jury was selected. We adopt with appropriate modification our previous conclusion about the trial court's evaluation of the State's peremptorily challenging six black members, but no white members, of the venire: "The trial judge's adjudication that the State had made a prima facie case that Butler had used eleven of its twelve peremptory challenges discriminatorily against white members of the venire was supported by substantial evidence and was not erroneous."

We affirm the entirety of the trial court's adjudications on the *Batson* issues which both Butler and the State presented to it.

> **B. <u>ISSUE II</u>**: Whether the incompetent, uncorroborated, unreasonable, improbable, self-contradictory and substantially impeached testimony of the two accomplices properly support the verdict in this case?

This Court finds this to be a "two-for-the-price-of-one" issue. Butler not only attacks the credibility of Michael Harper and Jessie Banks as accomplices but also questions whether Banks' testimony was at all admissible because of his responses to several questions about the meaning of taking an oath and telling the truth.

**1. Banks' competency as a witness**

We first consider the latter issue which deals only with Banks' testimony. The State engaged in the following direct examination of Banks:

> Q. The Court just had you raise your hand and you took an oath. Do you recognize what it means to take that oath
>
> A. No, ma'am.
>
> Q. When you raised your right hand in front of the judge just a moment ago, do you know why you did that?
>
> A. No, ma'am
>
> Q. Do you know what it is to tell the truth?
>
> A. Yes, ma'am.
>
> Q. When the Court asked you if you were swearing to tell the truth in this case, do you recognize the importance of your telling the truth?
>
> A. Yes, ma'am.
>
> Q. Do you know now that you are required to tell the truth?

A. Yes, ma'am.

Q. So you do understand that?

A. Yes, ma'am.

At this point in the State's examination of Banks, Butler's counsel asked to voir dire Banks "if it's a question of qualifications." The trial court responded, "I don't think that its necessary. Move on." Butler's counsel asked Banks these questions on cross-examination:

Q. Jessie, when you raised your hand took the oath, you swore to tell the truth, didn't you?

A. Yes, sir.

Q. Do you know what would happen to you if you did not tell the truth?

A. No, sir.

BY MR. HOLMES: Your Honor, we challenge the witness' competence.

BY THE COURT: Denied. Move on.

BY MR. HOLMES: (Continuing)

Q. Do you know that you could be convicted of perjury?

A. No, sir.

Butler cites *White v. State*, 532 So. 2d 1207 (Miss. 1988) to support his position on this issue. In *White*, a death penalty case, the appellant argued that two key witnesses for the State, Sam Spearman and James Earl Spearman, were incompetent to testify because they "did not retain a full comprehension of their duty to tell the truth; . . . ." *Id.* at 1214. White argued that the two witnesses' failure to understand the oath they have taken undermined their entire testimony. *Id.* However, the supreme court noted that while Sam Spearman stated he did not know the meaning of the word "oath," he did testify to understanding what it meant to tell the truth, and that he had, in fact, done so. *Id.* Similarly, James Earl Spearman testified that he knew what was meant when he swore to tell the truth. The supreme court concluded:

In a jury trial, the jury is the arbiter of the weight and credibility of a witness' testimony. While this rule of law speaks to credibility rather than competency, the thrust of appellant's . . . argument is towards the former . . . . [W]e find that this portion of his argument addresses a factual question well within the province of the jury, and this Court will not set aside his conviction without concluding that the evidence taken in the most favorable light could not have supported a reasonable juror's conclusion that the defendant

was guilty beyond a reasonable doubt.

*Id.*

Rule 601 of the Mississippi Rules of Evidence states that "[e]very person is competent to be a witness except as restricted by the following: . . . ." M. R. E. 601. The three restrictions apply to spouses, perjurers, and court-appointed appraisers in eminent domain cases. In *Ryan v. State*, 525 So. 2d 799, 801 (Miss. 1988), appellant's counsel argued that a six-year-old kindergarten student, whom the State called as a witness, "failed to express intelligent answers, had poor recollection, and *did not fully understand the duty to speak the truth*." (emphasis added). The trial court had allowed her to testify after it had conducted a pre-Rule-601 procedure by examining the child to determine whether she was competent to testify. *Id.* The Mississippi Supreme Court upheld the trial court's allowing her by appearing to rely exclusively on Rule 601. *Id.* That court opined:

> In addition to the persuasive testimony of Alicia, this Court holds that this argument is settled by the wording of Mississippi Rule of Evidence 601. Under Rule 601, "[e]very person is competent to be a witness." Therein, the trial court did not err in allowing the testimony of [this child]; rather, his action is supported by the record.

*Id.*

In the case *sub judice*, Banks, not unlike the Spearman witnesses in *White*, testified that he knew what it meant to tell the truth, that he recognized the importance of telling the truth, and that he understood that he was required to tell the truth. Rule 601 submitted Banks' credibility to the jury for its acceptance or rejection, in whole or in part. We decide this first sub-issue against Butler and affirm the trial court's denial of Butler's challenge to the competency of Banks as a witness which Butler made on his counsel's cross-examination.

**2. The "weight and worth" of testimony of Banks and Harper as accomplices**

As we begin our consideration of this second part of Butler's second issue, we note that the trial court granted Jury Instruction No. 3, which read:

> The testimony of an accomplice is to be considered and weighed with great care and caution. You may give it such weight and credit as you deem it is entitled.

As he did in his closing argument before the jury Butler's counsel argues in his brief the reasons that the testimony of Harper and Banks was so "incompetent, uncorroborated, unreasonable, improbable, self-contradictory and substantially impeached" that it could not support the jury's verdict of his guilt. He emphasizes the contradictions between their respective testimonies about the events of the night when Jones was killed and Harper's admission under cross-examination that he "lied five times to the police" the first time they questioned him about what happened. He then cites several Mississippi Supreme Court decisions in which that court has reversed and rendered a defendant's conviction of felony because the only testimony of guilt came from an accomplice whose testimony that court

found to be totally unreliable for a variety of reasons.

For example, in *Jones v. State*, 368 So. 2d 1265 (Miss. 1979), the Mississippi Supreme Court reversed the appellant's conviction of grand larceny because it found that the conviction rested solely on the testimony of an accomplice, Clarence Hawkins. *Id.* at 1265. Hawkins had stolen a tractor in Cleveland and transported it to Arkansas, where he sold it for $7,000. *Id.* at 1265-66. Hawkins testified that he kept $2,500 and gave the remaining $3,500 to Jones. *Id.* Jones testified that he had checked into a motel room in Cleveland so he could not have been where the tractor had been stolen when it was stolen. *Id.* at 1266. Two witnesses verified Jones' alibi. *Id.* About Hawkins testimony the supreme court opined:

> The case against Jones, a man of no previous criminal record, rests then upon the testimony of Hawkins, a convicted felon awaiting sentence following his plea of guilty, which is flatly contradicted by Jones and two other witnesses. At every point from beginning to end, where there is corroboration, it was Hawkins himself who acted. His statement that everything he did was in compliance with a request from Jones, a man he had known only two or three weeks, strains credulity. It is noted that the points at which Hawkins said Jones was involved had the virtue, from Hawkins' standpoint, of being such as could not easily be disproved. Every fact capable of being proved, other than by Hawkins' own testimony, showed Hawkins acting alone.

*Id.* at 1266. Two justices dissented because to them there was sufficient evidence to constitute an issue of fact for the jury to resolve, included in which issue was Hawkins' credibility. *Id.* at 1271-73. Thus, the dissenting justices would have affirmed Jones' conviction. In two other cases, *White v. State*, 146 Miss. 815, 819, 112 So. 27, 28 (1927), and *Pegram v. State*, 228 Miss. 860, 89 So. 2d 846 (1956), the Mississippi Supreme Court reversed criminal convictions because it found that they were based solely on the testimony of accomplices whose testimony that court elected to reject because it lacked substance and credibility.

In many, many cases the Mississippi Supreme Court has affirmed a conviction of crime based on the uncorroborated testimony of an accomplice. *See Evans v. State*, 460 So. 2d 824, 827 (Miss. 1984) (Evidence, including informer's testimony as to defendant's involvement in initial negotiations for sale of marijuana, his involvement in aborted transactions and presence near scene of successful transaction, and defense witness' testimony that defendant admitted obtaining marijuana for transaction, was sufficient to make case proper for jury's resolution, even if the middleman's testimony was not considered.); *Fairchild v. State*, 459 So. 2d 793, 798 (Miss. 1984) (Although accomplice's testimony in murder case was vague and imprecise at points, the court found his testimony to be credible on the critical matter of Fairchild's involvement in the murder and robbery of the victim.).

Butler does not contest that Jones was slain in the aftermath of a drug deal gone sour. He only contests the testimony of Banks and Harper that he was there and Harper's testimony that Butler asked him to give him his pistol with which he then shot Jones. Yet, the testimony of both Banks and Harper was factually sufficient to establish that Butler shot Jones as he was emptying Harper's pistol of its five bullets. Notwithstanding the trial court's instruction that "[t]he testimony of an accomplice

is to be considered and weighed with great care and caution," the jury must have found Banks' and Harper's testimony a sufficiently credible basis on which to rest its verdict of Butler's guilt of manslaughter. So do we. We decide the second part of this issue adversely to Butler.

### C. ISSUE III: Was the jury properly instructed on reasonable doubt?

Butler submitted the following instruction to the trial court to be given the jury:

JURY INSTRUCTION NO. D 7

> Reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the Defendant "Not Guilty".

The record shows that when the State objected to this instruction, the trial court refused it. Butler's counsel offered no argument to persuade the court that it should be granted. Thus, the State relies on *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744 (Miss. 1996) to contend that this issue is procedurally barred. In *Gollott* the appellant's representative complained that the trial court had refused to grant one of its instructions; but the supreme court noted that the appellant had failed to object to the trial court's refusal of that instruction. *Id.* at 752. It then concluded that it was "not bound to address the alleged error on appeal." *Id.*

However, Butler cites *Conner v. State*, 632 So. 2d 1239 (Miss. 1993) to support his proposition that "this exact jury instruction which was offered should have been given by the court." The State counters this argument by asserting that "the recognition by the Court in *Conner* that the court *may* grant an instruction like the one requested if it wishes to do so, is far from what Butler urges, a requirement that it do so if requested." In *Conner*, the appellant argued that the trial court erred when it refused to grant a "circumstantial evidence" instruction. *Conner,* 632 So. 2d at 1256. Of course, that circumstantial evidence instruction had nothing to do with an instruction on "reasonable doubt." Yet, Conner had argued that it "contained language essential to the definition of the 'beyond a reasonable doubt' standard applicable to all cases, direct or circumstantial." *Id.* The *Conner* court held that the trial court did not err when it refused to grant the "circumstantial evidence" instruction and that the "circumstantial evidence" instruction contained nothing that defined "reasonable doubt." *Id.* at 1257. It only noted that the trial court's "Instruction C- 7 fully explain[ed] the manner in which the jury should apply the reasonable-doubt standard to the evidence." *Id.* True, Instruction C-7 was identical to Butler's requested Instruction D-7 in the case *sub judice*, but *Conner* did not hold that the trial court must submit its Instruction C-7. *Id.* It only held that the court's Instruction C-7 explained the manner in which the jury was to apply the reasonable-doubt standard to the evidence. *Id.*

The Court holds that Butler's counsel's failure to object to the trial court's denying his Instruction D-7 must bar his presentation of this issue to us; but even so, the court cannot be put in error based on the only case which Butler cites in his argument on this issue, *Conner v. State*. We resolve Issue III. adversely to Butler's argument and affirm the trial court's refusal to grant Instruction D-7.

**D. <u>ISSUE IV</u>**: Whether the verdict was a product of duress?

We quoted extensively from the record in preparation for our consideration of this fourth issue. A fair summary of the material quoted from the record seems to be that when the jury sent the judge a note that they had reached a verdict, although one juror wished to advise the court that her vote was "under duress," the trial court assembled the jury in the courtroom to learn more about the verdict which it had reached. After the trial judge received the jury's verdict from the hands of the bailiff and showed it to the prosecutor and Butler's counsel, he polled the jury. The result of that poll was that their verdict was unanimous. Their verdict was "Guilty of manslaughter." Nevertheless, the trial judge instructed the jury that if any vote in that verdict was under duress, he could not accept it as the unanimous verdict which the law demanded. The trial judge then again read Instruction No. 7 to the jury and instructed them to retire to the jury room so that they might consider what he had said to them. He then directed that if they reached another verdict, they were to write it anew on another sheet of paper, which he furnished them, and return with it into open court. The jury did as they were instructed by returning a second verdict into open court, which verdict was also "guilty of manslaughter," and the trial judge again polled the jury. Only this time, he specifically inquired, "Do each of you understand I'm asking did you vote for finding of guilty of manslaughter *without duress from the other members of your panel*?" (Emphasis added). The result of this second poll for this second verdict was that it was unanimous. This time, Butler's counsel stated that he wanted to know "which juror initially felt that he or she was under duress." The judge refused his request because he thought that he had "made sufficient inquiry."

The Uniform Rules of Circuit and County Court were adopted by the Mississippi Supreme Court to become effective as of May 1, 1995. This case was tried from May 15 through May 17, 1995. Thus, the Uniform Rules of Circuit and County Court govern the trial court's conduct of the trial of the case *sub judice*. Rule 3.10 of the Uniform Rules of Circuit and County Court prescribe the court's control of the jury's deliberations and delivery of their verdict. The portion of that rule relevant to this issue reads as follows:

> When the jurors have agreed upon a verdict they shall be conducted into the courtroom by the officer having them in charge. The court shall ask the foreman or the jury panel if an agreement has been reached on a verdict. If the foreman or the jury panel answers in the affirmative, the judge shall call upon the foreman or any member of the panel to deliver the verdict in writing to the clerk or the court. The court may then examine the verdict and correct it as to matters of form. The clerk or the court shall then read the verdict in open court in the presence of the jury. The court shall inquire if either party desires to poll the jury, or the court may on its own motion poll the jury. If neither party nor the court desires to poll the jury, the verdict shall be ordered filed and entered of record and the jurors discharged from the cause, unless a bifurcated hearing is necessary. If the court, on its own motion, or on motion of either party, polls the jury, each juror shall be asked by the court if the verdict rendered is that juror's verdict. In a criminal case where the verdict is unanimous and in a civil case where the required number of jurors have voted in the affirmative for the verdict, the court shall order the verdict filed and entered of record and discharge the jury unless a bifurcated hearing is necessary. *If a juror dissents in a criminal case or in a civil case if less than the required number cannot agree the court may: 1) return the jury for further deliberations or 2) declare a mistrial.* No motion to poll the

jury shall be entertained after the verdict is ordered to be filed and entered of record or the jury is discharged.

URCCC 3.10 (emphasis added). Our comparison of the quoted portion of Rule 3.10 satisfies us that the trial court substantially complied with the procedure which this rule establishes for a jury's returning their verdict into open court. The sentence that we emphasized allows the trial court either to return a jury for further deliberations or declare a mistrial if a juror dissents in a criminal case. To us it appears that the trial court equated one juror's vote "under duress" with one juror's dissent to the jury's verdict and returned the jury to deliberate further after the jury had advised it that one juror was voting "under duress." Thus we conclude that the trial court complied with the provisions of Rule 3.10 in its manner of instructing the jury after it had reported with its first verdict and then returned them to deliberate further.

Butler cites *Morgan v. State*, 370 So. 2d 231, 232 (Miss. 1979), to support his position on this issue. In *Morgan*, the trial judge polled the jury to determine if all twelve members concurred in the guilty verdict *Id.* at 231. During that poll, the following exchange occurred between the trial judge and one of the jurors:

> COURT: Is this your verdict? Yes.
>
> BOONE: I guess so. . . . I did not want to be the one to hang the jury.
>
> COURT: Do not say anything else. Is this your verdict?
>
> BOONE: Yes.

*Id.* at 231-32. Following that exchange, the court accepted the verdict of "guilty" and discharged the jury. *Id.* at 232. It is true that the supreme court reversed the trial court's judgment of Morgan's guilt; but in doing so, the court opined:

> We are of the opinion that when the individual juror expressed a doubt as to whether he was voting his convictions in response to the instructions of the court or whether he was voting the way he did, contrary to his convictions, so as not to be unpopular with his fellow jurors, the judge should not have cut the juror off from expressing his feelings. The judge should have allowed the juror to express himself and then inquired whether the juror desired additional time in which to consult with his fellow jurors, *or he could have declined to poll the jury further and returned the jury for further deliberation.* In either event, additional instructions appropriate to the circumstances could be given if requested by the attorneys in writing or if deemed necessary by the court.

*Id.* (emphasis added). In the case *sub judice* the trial court did precisely what the supreme court said

ought to have been done, *i. e.*, he returned the jury to deliberate further. We conclude that *Morgan v. State* does not support Butler's position on this issue, but instead affirms the action which the trial judge took when he learned that one of the juror's verdict was "under duress."

Butler also cites *Martin v. State*, 415 So. 2d 706 (Miss. 1982) in support of his argument. While that the supreme court reversed Martin's conviction; it did so not because of a juror's expressed uncertainty about his or her own verdict but because the trial judge advised the jury that in reaching their verdict, they could recommend mercy to the court. *Id.* at 707. The advice was given by the trial court because two of the jurors had indicated that they would not change their votes unless they could "plead for a sentence." *Id.* The supreme court opined that the trial court's instruction that the jury could recommend mercy could have been interpreted as an invitation by the trial judge that the jury's recommendation would have a bearing on the appellant's punishment and might have caused the two jurors to change their verdicts to guilty. *Id.* at 709. In the case *sub judice* no juror expressed any concern about the consequences of his or her verdict.

Finally, Butler cites *Girton v. State*, 446 So. 2d 570, 572-73 (Miss. 1984), to assert that the trial judge must know precisely what the juror's or jurors' problem is before he or she can further assist the jury. He notes that in the case *sub judice*, the trial judge observed that the term "duress" could have various meanings, and thus he remained unsure of what the juror was complaining when she advised that her vote was cast "under duress." However, that may be, the trial judge re-read an instruction to the jury and returned them to deliberate further, a procedure to which Butler's counsel agreed according to the record. This Court holds that the trial judge managed the jury's deliberations harmoniously with Rule 3.10 and *Morgan v. State*. Thus, it never became necessary for the trial judge to know precisely what the juror's problem was before he further reinstructed the jury about its deliberations. This Court notes that at no time did the trial intrude into the juror's reasons for her assertion that her vote was "under duress" nor reveal what vote she might otherwise cast were she not under duress. Instead, the trial court preserved the confidentiality of her deliberation even after Butler's counsel had requested that he be allowed to question her about why she had reported that her vote was "under duress."

In *Fairman v. State*, 513 So. 2d 910, 915-16 (Miss. 1987), a case which Butler cites in his brief on this issue, the supreme court affirmed the appellant's conviction of murder less than capital. *Id.* at 916. The appellant attempted to show that the jury had been informed either by a bailiff or by one of their members that if they did not reach a verdict that night, they would be "locked-up for the night" so that they could deliberate further the next morning. *Id.* at 915. Appellant charged that this information had placed undue stress on the jurors to reach a verdict that night. *Id.* The trial court questioned the jurors only about whether any person had entered the jury room that night to advise them as appellant charged. *Id.* He refused to ask the jurors if one of their own members had made that statement. The Mississippi Supreme Court held that "the trial judge, in the exercise of his sound judicial discretion, handled the matter with circumspection, followed the established law in this state, and did not commit error" by restricting questioning to what other persons who came into the jury room may have advised the jury. *Id.* at 916. The supreme court noted: "The law is settled in this state that jurors will not be permitted to impeach a verdict rendered by them." *Id.* At 915 (citations omitted).

Mississippi Rule of Evidence 606(b) incorporates this jurisprudential maxim in the following

language:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

M.R.E. 606(b). Butler's counsel only stated to the court that he would like to know what juror was under duress; he did not inform the trial judge about why he wanted this information. Butler did not include the trial court's refusal to identify the juror as a ground for a new trial in his motion for new trial; neither did he include in his motion for new trial an allegation that the jury or juror had been subjected to "extraneous prejudicial information [which had been] improperly brought to [their] attention" or that "any outside influence [had been] improperly brought to bear upon any juror" as Rule 606(b) requires.

For all of the foregoing reasons, we conclude that the trial judge in the case *sub judice* "handled the matter with circumspection, followed the established law in this state, and did not commit error." *See Fairman*, 513 So. 2d at 916. Thus we decide Butler's fourth issue against him and affirm the trial court's management of the jury's deliberations in this case.

**E. <u>ISSUE V</u>**: Should the court have admitted the affidavit of Marvin Hayes?

**1. Trial Procedure**

When Butler's counsel began to examine Marvin Hayes, who was among the group with whom Jones dealt, Hayes stated his name, his address, that he was a student at Wingfield High School, and that he knew Terry Butler and Michael Harper. Butler's counsel then asked Hayes if he recalled an event that occurred on September 3, 1994, on Summer Street, to which the witness refused to reply. His reason was that he was "pleading the Fifth Amendment." After the witness persisted in "taking the Fifth," Butler's counsel asked to be heard outside the presence of the jury.

Once outside the presence of the jury, Butler's counsel asked the trial judge to declare that Hayes was an unavailable witness because he had asserted his Fifth Amendment rights. The trial judge initially expressed doubt that Hayes was entitled to assert his right not to incriminate himself through his testimony. Hayes' attorney, who was present at this conference, advised the trial judge that his client, Marvin Hayes, had been indicted for two felonies, burglary of a house and the sale of narcotics. After further questioning of Hayes' counsel about his client's reticence to testify about what he had seen occur on Summer Street, the trial judge held that Hayes was entitled not to incriminate himself by testifying as Butler's witness and that therefore Hayes was "unavailable" as a witness.

After the trial judge found that Hayes was unavailable as a witness, Butler's counsel examined Hayes

outside the presence of the jury about an affidavit which Hayes had made on April 7, 1995. The salient portion of this affidavit read as follows:

> On September 3, 1994, late in the evening, I was on Summer Street and I observed the following: a white male on a motorcycle pulled up on Summer Street and Michael Harper and Jessie Banks (a/k/a "Man") ran out to him. This white male asked for $40 worth of cocaine, and Michael Harper gave him a rock and Jessie Banks gave him a rock; then the white male gave Michael Harper what appeared to be a small roll of money, and Michael Harper unrolled it and some paper fell to the ground which was not money, as the white male drove off slowly. I then saw Michael Harper pull out a pistol and shoot 4 or 5 times in the direction of the white male. The white male appeared to be hit with these shots and wrecked his motorcycle.

> I did not see Terry Butler a/k/a "Pedru" on the scene described above that evening anywhere. Terry Butler did not shoot the white male and was not involved in this shooting in any way whatsoever.

After Butler's counsel questioned Hayes, he moved to admit the affidavit, even though obviously hearsay, under Exceptions (1), (3) and (5) of Mississippi Rule of Evidence 804(b). With regard to Exception (1), *Former Testimony*, Butler's counsel acknowledged that the affidavit had not been given at an earlier hearing, but he asserted that it was sufficient former testimony because the affidavit was under oath before a notary public. With regard to Exception (3), *Statement Against Interest*, Butler's counsel argued that Hayes was "taking the Fifth Amendment, which made it a statement against penal interest. As for Exception (5), *Other Exceptions*, he argued that it "ha[d] other indicia of reliability similar to the several listed under 803." However, he did not specify what those indicia of reliability were.

After the State responded to Butler's arguments on each of the three exceptions, the trial judge held that the affidavit "clearly would not fall under exception 804(b)(1)." With regard to Exception (3), the trial court stated, "I see nothing that indicates it's against his interest." We quote in detail from the record to state the trial judge's adjudication about whether Hayes' affidavit was admissible under Exception 804(b)(5):

> Under [Rule 804(b)(5)] it requires a weighing process by me. And (a), it is offered as evidence of a material fact; (b), I cannot say that it is more probative on the point than is offered by any other evidence.

> There are other individuals who were present who may or may not be available to testify. . . . . Even though it would be a benefit to the defendant to have this as a statement, also the general interest of justice is based on the premise of cross-examination of witnesses' testimony.

After the trial judge had engaged in the previously quoted weighing process of Hayes' affidavit which

Rule 804(b)(5) required, he denied its admission into evidence.

## 2. Consideration and application of the law

### a. Hayes' right to refuse to incriminate himself

Butler begins his argument on this issue by asserting that the trial court ought to have required Hayes to testify because "there was no risk of prosecution" and because "Hayes waived his Fifth Amendment privilege by giving the affidavit." To support his argument on this part of this issue, he cites only one case, *Hentz v. State*, 496 So. 2d 668 (Miss. 1986), in which the Mississippi Supreme Court affirmed the trial court's imposing penalties for direct contempt on the appellant because he refused to answer six questions after the court had ordered him to answer them. *Id.* at 669. Prior to Hentz's taking the stand, the trial court thoroughly instructed him about the hazards that appearing as a witness presented, including contempt citation on a question-by-question basis. *Id.* at 670. The trial court even appointed the public defender to be with him during the course of his testimony. *Id.* The court also took a lengthy recess in order to allow a conference between Hentz and his counsel, who advised him not to testify. *Id.*

In the case *sub judice*, Hayes refused to answer Butler's questions as soon as the basic introductions were completed. Hayes' counsel was present and advised the trial judge that he had advised his client not to testify. The United States Court of Appeals for the Fifth Circuit opined: "[i]f the witness is still subject to prosecution for other crimes which his testimony might tend to reveal, the privilege [against self-incrimination] remains." *In re Bryan*, 645 F.2d 331, 332 (5th Cir. 1981). In *Smith v. State*, 527 So. 2d 660, 664 (Miss. 1988), the Mississippi Supreme Court held:

> Smith certainly had a right to call witnesses in his behalf but it was not his right to force a witness to testify to matters which might incriminate that witness. Defendant's right to the testimony of a witness extends only to the limit of the witness' right against self-incrimination.

In the case *sub judice*, Hayes was at the scene of the homicide, and he was under two indictments for crimes unrelated to Jones' death. Because Hayes was subject to prosecution for other crimes which his testimony might tend to reveal, his privilege against self-incrimination remained; and the trial judge did not err when he allowed Hayes to invoke his right against self-incrimination.

Because the trial judge's allowing Hayes to invoke his right against self-incrimination was correct, Hayes became unavailable within the meaning of Rule 804(a). Thus, this Court now considers whether the trial judge erred when he denied Butler's motion to introduce Hayes' affidavit into evidence.

### b. Rule 408(b)(5) *Other Exceptions*

Butler does not argue that Hayes' affidavit is admissible either as former testimony pursuant to Rule 408(b)(1), which it clearly was not, or as an admission against penal interest pursuant to Rule 408(b)(3). It could hardly be considered an admission against penal interest because Hayes in no way implicated himself in the slaying of Jones, although he endeavored to exonerate Butler. Instead,

Butler relies on Rule 408(b)(5), *Other Exceptions*, to justify the admission of Hayes' affidavit into evidence.

In *Cummins v. State*, 515 So. 2d 869, 873 (Miss. 1987), the Mississippi Supreme Court established the following five conditions which the offered hearsay evidence must meet if the trial court is to admit it:

> (1) The proponent of the evidence must give the adverse party the notice specified within the rule.

> (2) The statement must have circumstantial guarantees of trustworthiness equivalent to the 23 specified exceptions listed in Rule 803.

> (3) The statement must be offered as evidence of a material fact.

> (4) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts.

> (5) The general purposes of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence.

The supreme court added: "When interpreting the identical Federal Rules of Evidence courts have required that these findings be made explicitly on the record." *Id.*

As we previously noted by quoting a portion of the trial judge's statements in the record, the trial judge in the case *sub judice* found on the record that Hayes' affidavit did not meet all five of these conditions; and he therefore denied Butler's motion to admit it into evidence. He did not question that Hayes' statement that Butler was not at the scene of Jones' homicide was not evidence of a material fact. However, he stated with regard to the probative value of the affidavit that he could not say "that it is more probative on the point than is offered by other evidence." Neither can this Court say that Hayes' affidavit is more probative on the point of whether Butler was present than was the testimony of the members of Butler's family and one other witness who testified that Butler was at home passed out on the floor of the front room from having tried to "chug-a-lug" a pint of Seagram's gin.

It appears to this Court that perhaps it was the fifth condition that the trial court found most persuasive. The trial court opined that "[e]ven though it would be a benefit to the defendant to have this as a statement, also the general interest of justice is based on the premise of cross-examination of [a] witness' testimony." Butler's counsel argued that if Hayes' affidavit were admitted, the State could still cross-examine Hayes; but the trial court replied, "Not if he takes the Fifth Amendment, [it] can't." To establish the trustworthiness of Hayes' affidavit, Butler argues that the statement was taken under oath, with the assistance of counsel, is not self-serving in any way, and is based on personal knowledge." He also asserts that it is against penal interest under 804(b)(3) because Hayes pled the Fifth Amendment; however, we earlier noted that the affidavit did not inculpate Hayes in Brown's slaying. Butler cites no cases to support his assertion that Hayes' affidavit was against penal interest; so we apply the plain language of Rule 804(b)(3) to determine that it was not against Hayes' penal interest.

An oath alone is insufficient to add trustworthiness to hearsay testimony. *See United States v. Fernandez*, 892 F.2d 976, 981 (11th Cir. 1990) in which the United States Court of Appeals for the Eleventh Circuit stated:

> An oath alone, however, is an inadequate safeguard to meet the requirement of Rule 804(b)(5) that the statement have "equivalent circumstantial guarantees of trustworthiness"; otherwise, Congress could have dispensed with the cross- examination requirement codified in Rule 804(b)(1).

Rule 102 of the Mississippi Rules of Evidence provides that the Mississippi Rules of Evidence "shall be construed to secure . . . promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." M.R.E. 102. The trial judge expressed his concern that were he to admit Hayes' affidavit, the State would be unable to cross-examine Hayes, who, the trial judge assumed, would continue to decline to answer because his answers might incriminate him.

We concur with the trial judge's observation that "the general interest of justice is based on the premise of cross-examination of [a] witness' testimony." We conclude that he found that admitting Hayes' affidavit under circumstances that most likely would frustrate the State's cross-examination of Hayes was "not in the general interest of justice." Because the trial judge made explicitly on the record his finding that Hayes' affidavit was not admissible and because we agree that the probable inability of the State to cross-examine Hayes about his statement would frustrate the ascertainment of its truthfulness, we affirm the trial court's denial of Butler's motion to admit Hayes' affidavit into evidence and decide this issue adversely to Butler.

**F. ISSUE VI**: Did the Court err by limiting defense counsel's closing argument?

The subject of this issue is the following portion of the closing argument which Butler's counsel made, to which the State objected, and which the trial court sustained:

> BY BUTLER'S COUNSEL: We had asked two witnesses to testify to you who took the 5th amendment. The first was Marvin Hayes and the second was an individual named Steve Earl Williams. Now, both of those -- well, Marvin Hayes, his name came up during the testimony Michael Harper and also during the testimony of Jessie Banks. He was placed on the scene. He was advised by his lawyer not to testify, and you observed that in court right before you. He also indicated that previously he had indicated to me that he was going to testify and that he had changed his mind
>
> BY THE STATE: To which we object, your Honor.
>
> BY THE COURT: Sustained.

BY BUTLER'S COUNSEL: You can, I think, consistent with the Court's instructions, draw whatever reasonable inferences that you want to from these individuals asserting their 5th amendment not to testify. The inference would be that -- I suggest to you that whatever they had to say somehow placed them on the scene.

BY THE STATE: May it please the Court, we object to this entire line of argument.

BY THE COURT: Sustained.

Butler argues that counsel may argue as to "facts introduced into evidence, deductions and conclusions he may reasonably draw therefrom," citing *Davis v. State*, 530 So. 2d 694, 701-02 (Miss. 1988), and that it is a proper function of closing argument "to draw conclusions and inferences from evidence . . . so long as [counsel] does not go outside the confines of the record," citing *Williams v. State*, 595 So. 2d 1299, 1309 (Miss. 1992). He concludes by suggesting that if it is appropriate to argue unfavorable inferences from a party's not waiving medical privilege in a civil suit, then such a principle should be applied to this issue. Thus, Butler argues that "[d]efense counsel should be allowed to make reasonable argument about reasonable inferences which could be drawn from a witness's asserting his or her privilege not to testify, so long as he or she remains within the confines of the record."

The subject of Butler's argument is the protection from compulsory self-incrimination which both the Fifth Amendment and Section 26 of the Mississippi Constitution assure all of us. In *Grunewald v. United States*, 353 U.S. 391, 77 S. Ct. 963. 1 L. Ed. 2d 931 (1957) the United States Supreme Court wrote that "[n]o implication of guilt could be drawn from [the witness'] invocation of his Fifth Amendment privilege before the grand jury." *Grunewald*, 77 S. Ct. at 982. In *Balfour v. State*, 598 So. 2d 731 (Miss. 1992), the Mississippi Supreme Court confronted a situation in which one of the witnesses whom the defendant called as her witness invoked the Fifth Amendment. *Id*. at 750-51. To "impeach" this witness the trial court allowed the State to cross-examine the witness by reading portions of his earlier statement and asking him if he made those statements. *Id*. The issue became whether the State could impeach a witness who invoked his right against self-incrimination. *Id*. at 751. The supreme court held that it could not because "[w]hen a witness invokes the Fifth Amendment, his silence does not constitute a denial which may be impeached." *Id*. (citations omitted). It therefore seems reasonable that if the witness's invocation of the Fifth Amendment does not constitute a denial which can be impeached, then it ought also not constitute a matter from which the jury could draw any inference of any kind. If the jury in the case *sub judice* could draw no inference of any kind from Hayes' refusal to testify, then the trial judge did not err when it sustained the State's objection to Butler's counsel's argument about the inferences the jury might draw from his invocation of the Fifth Amendment.

In *People v. Diaz*, 296 N.W. 2d 337 (Mich. Ct. App. 1980), Diaz, the appellant wanted to call one Mike Casarez as a defense witness to establish that only Casarez was involved in the heroin sale for which Diaz had been convicted *Id*. at 341. At a hearing outside of the jury's presence, Casarez stated

his name and address but invoked his right to remain silent as to any other questions. *Id.* After Casarez refused to answer any further questions, the trial judge would not allow Diaz to call him to the stand in the presence of the jury. *Id.* On appeal Diaz claimed that Casarez's exercise of his privilege against self-incrimination should have been placed before the jury because it would have aided defendant's theory that Casarez alone had delivered the heroin. *Id.* The Michigan Court of Appeals affirmed the trial court's refusal to allow Diaz to put Casarez on the stand for the purpose of having the jury witness Casarez's invoking his right against self-incrimination. This Court acknowledges that this result is not the law in Mississippi because a criminal defendant can call a witness to testify even though the defendant understands that the witness will take "take the Fifth." *Balfour v. State*, 598 So. 2d 731, 751 (Miss. 1992) (A criminal defendant must be allowed to call witnesses to the stand even though the defendant is aware that the witness, if called, will invoke the Fifth Amendment to every question.).

Nevertheless, the Michigan Court of Appeals opined as follows about the witness' failure to testify because he invoked his right against self-incrimination:

> As a matter of public policy, we believe the exercise of a witness's constitutional right to remain silent should not be used as evidence to support an inference for either side. Such an inference is wholly speculative since it rests on litigants' perception of juries' foibles. A jury may infer the refusal to testify is a confession implicating defendant or may somehow believe defendant was not involved since his accomplice would not testify. Neither inference is desirable because the former is obviously prejudicial to defendants while the latter inference cannot be combated by the truth testing device of cross-examination due to the constitutional rights of the witness. Nor can the evidence be termed "relevant evidence". Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The wholly speculative inference advanced by defendant does not make the existence of any fact of consequence more probable or less probable.

*Diaz*, 296 N.W. 2d at 341. Mississippi Rule of Evidence 401 defines what is relevant evidence as follows:

> "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

M.R.E. 401.

We agree with the Michigan Court of Appeals statement that "[t]he exercise of a witness's

constitutional right to remain silent should not be used as evidence to support an inference for either side." *See Diaz*, 296 N.W. 2d at 341. We further agree with that court that "[t]he wholly speculative inference advanced by defendant does not make the existence of any fact of consequence more probable or less probable," a condition to the relevancy of evidence which Mississippi Rule of Evidence 401 requires. Thus, we conclude that the trial court did not err when it sustained the State's objection to Butler's closing argument that the jury might "draw whatever reasonable inferences that [they] wanted to from these individuals asserting their [Fifth] [A]mendment not to testify." We resolve this issue adversely to Butler.

## IV. Summary

Butler has raised issues dealing with (1) his "*Batson*" challenge to the State's use of its peremptory challenges against Black members of the venire and the State's "*Batson*" challenge to his use of peremptory challenges against White members of the venire; (2) the weight of the evidence which two "accomplices" provided the State against his innocence of the crime of murder or manslaughter; (3) the trial court's proper instructing of the jury on "reasonable doubt;" (4) the question of whether the jury's verdict was a product of duress; (5) the trial court's refusing to admit into evidence the affidavit of Marvin Hayes after he had become unavailable because he had invoked his right not to incriminate himself through his testimony, and (6) the trial court's limiting his closing argument by sustaining the State's objection to his argument about the inferences the jury might draw from Hayes' refusal and another witness' refusal to testify. The consequence of our review and analysis of these six issues is that we have affirmed the trial court's decisions on all six of them.

**THE HINDS COUNTY CIRCUIT COURT'S JUDGMENT OF THE APPELLANT'S GUILT OF THE CRIME OF MANSLAUGHTER AND ITS SENTENCE TO A TERM OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. COSTS ARE ASSESSED TO HINDS COUNTY.**

**FRAISER, C.J., BRIDGES AND THOMAS, P.JJ., BARBER, DIAZ, KING, McMILLIN, PAYNE, AND SOUTHWICK, JJ., CONCUR.**